PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 26 1998**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

EMIL A. TONKOVICH,

    Plaintiff-Appellee,

v.

KANSAS BOARD OF REGENTS,
ROBERT C. CALDWELL, TOM E.
HAMMOND, JOHN B. HIEBERT,
KAREN KREPPS, JOHN G.
MONTGOMERY, PHYLLIS NOLAN,
FRANK C. SABATINI, SIDNEY
WARNER, GENE A. BUDIG,
DELBERT M. SHANKEL, P.
DELBERT BRINKMAN, DAVID E.
SHULENBURGER, ROBERT H.
JERRY, II, SIDNEY A. SHAPIRO,
REGINALD L. ROBINSON, A.
KIMBERLY DAYTON, ELINOR P.
SCHROEDER, ELLEN E. SWARD,
SANDRA C. McKENZIE, ANN
VICTORIA THOMAS, ROSE A.
MARINO, H. RUTHERFORD
TURNBULL, III, NANCY ANN
DAHL, E. P. JOHNSEN, JOHN
MICHEL, DELORES RINGER, and
ROBERT HEMENWAY, individually
and in their official capacities,

    Defendants-Appellants.

Nos. 96-3402, 96-3403, 96-
3404, 96-3405, 96-3406, 96-
3407, 96-3408

---

Timothy Mustaine (James M. Armstrong and Mary Kathleen Babcock with him on the brief), Foulston & Siefkin, L.L.P., Wichita, Kansas, for Defendant-Appellant in Case No. 96-3402.

William Scott Hesse, Assistant Attorney General (Carla J. Stovall, Attorney General, Kevin D. Case, Assistant Attorney General on the brief), Topeka, Kansas, for Defendants-Appellants in Case No. 96-3403.

Andrew F. Sears (Robert F. Bennett and David C. Wetzler with him on the brief), Bennett Lytle Wetzler Martin & Pishny, L.C., Prairie Village, Kansas, for Defendants-Appellants in Case No. 96-3404.

John I. O'Connor, The Advocates Group, Pittsburg, Kansas, for Defendant-Appellant in Case No. 96-3405.

Thomas A. Hamill (Kathryn Gardner with him on the brief), Martin, Pringle, Oliver, Wallace & Swartz, Overland Park, Kansas, for Defendants-Appellants in Case No. 96-3406.

Michael Evan Jaffe (James H. Hulme, Eric B. Bruce, Arent Fox Kintner Plotkin & Kahn, Washington D.C., and Bruce D. Mayfield, Overland Park, Kansas, with him on the brief), Arent Fox Kintner Plotkin & Kahn, Washington, D.C., for Defendants-Appellants in Case No. 96-3407.

Jeffrey A. Chanay (J. Phillip Gragson and Gail D. Edson with him on the brief), Entz & Chanay, P.A., Topeka, Kansas, for Defendants-Appellants in Case No. 96-3408.

Richard P. Hutchison, Landmark Legal Foundation, Kansas City, Missouri, for Plaintiff-Appellee.

---

Before  **HENRY** , **McWILLIAMS** , and **LUCERO** , Circuit Judges.

---

**HENRY** , Circuit Judge.

_____

This is a consolidation of seven separate appeals spawned by one district court case.  Professor Emil Tonkovich, a law professor at the University of Kansas School of Law ("the Law School"), filed a complaint challenging his dismissal, alleging under 42 U.S.C. § 1983 that the University violated his First Amendment speech rights, and his Fourteenth Amendment due process and equal protection rights.  He also alleged several state claims, which are not before us.  Although the district court granted the defendants' motions to dismiss based on qualified immunity with respect to the First Amendment claim, it denied the motions to dismiss the Fourteenth Amendment claims.  The defendants appeal this partial denial of their motions to dismiss, asserting their entitlement to qualified and absolute immunity.  Because we resolve these appeals on qualified immunity grounds, we need not reach the issue of absolute immunity.   Even taking Professor Tonkovich's allegations as true, they are insufficient to show that the defendants subjected him, or caused him to be subjected, to the violation of a clearly established right of constitutional dimension.  Thus, we reverse the district court's denial of qualified immunity on Professor Tonkovich's procedural due process, substantive due process, and equal protection claims.

## I.  STATEMENT OF THE CASE

**A. Legal Standard**

On appeal from a motion to dismiss, we must accept all of the well-pleaded allegations in the complaint as true. Albright v. Oliver, 510 U.S. 266, 268 (1994). However, we need not accept conclusory allegations. Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir. 1984). We must liberally construe the pleadings and draw all reasonable inferences in favor of the plaintiff. Id. Accordingly, the facts recited herein are gleaned from Professor Tonkovich's first amended complaint. [1] As we analyze the issues presented by the doctrine of qualified immunity, which we shall discuss below in greater detail, we are guided by the Supreme Court's statement of our task:

> An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions . . . .

Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985).

**B. Overview**

Professor Tonkovich was employed as a faculty member at the Law School beginning in August 1981. In 1986, he became a tenured faculty member. In

---

[1]As the district court noted, "[Professor Tonkovich's] 101-page amended complaint is the antithesis of the 'short and concise' pleading requirement of Fed. R. Civ. P. 8(a)." Aplts' App. vol. IV, doc. 18 at 1313. Indeed, it reads like an amalgamation of a complaint and a response to a motion for summary judgment.

4

1991, a graduating law student ("the Law Student") complained that, during her first year of law school, Professor Tonkovich had engaged in a sexual act with her after discussing her grades. Officials in the Chancellor's office conducted an investigation, enlisting the assistance of various Law School faculty members and the Dean of the Law School.

During the investigation, the Chancellor's office issued written findings and recommendations regarding the appropriate disciplinary action to be taken in Professor Tonkovich's case. A period of settlement negotiations ensued. Eventually, the Chancellor filed official written charges against Professor Tonkovich. An evidentiary hearing was conducted before a standing University Hearing Committee, which issued its decision and recommendation to the Chancellor, who dismissed Professor Tonkovich from the faculty in 1993. Professor Tonkovich then took an appeal to the Board of Regents. What follows are the details of the events surrounding Professor Tonkovich's dismissal, which form the basis of his claims.

### C. Facts

In May 1991, just after her graduation from the Law School, the Law Student went to Robert Jerry, Dean of the Law School, and complained that Professor Tonkovich had made a pass at her in the fall of 1988. Dean Jerry informed Professor Tonkovich that a female student had complained about his

conduct.  However, he did not name the student, nor did he provide any details about the nature of the allegation.  Professor Tonkovich denied misconduct and asked to confront his accuser.  During July and August 1991, Professor Tonkovich repeatedly requested that Dean Jerry disclose the name of his accuser and the nature of the allegation, but the Dean refused to do so.

In August 1991, the Law Student filed a formal written statement with Vice Chancellor P. Delbert Brinkman, alleging that in July 1988, when she was a first-year law student, she had engaged in a sexual act with Professor Tonkovich, who was her professor at the time, and that the act was preceded by a discussion of law school grades.  That same day, a local television news crew came to the Law School.  The station later aired a segment about allegations of sexual misconduct against various law professors, who were not named.  Later that day, Professor Tonkovich learned the name of his accuser.  Shortly after the Law Student filed her written statement, Law Professor Elinor Schroeder told Vice Chancellor Brinkman that some faculty members thought the Law Student was unstable and that the accusations were part of a conspiracy against Professor Tonkovich.

The University established September 6, 1991 as the deadline for submitting complaints against Professor Tonkovich.  Professor Tonkovich's response, filed on September 9th, denied the Law Student's allegation and denied

sexually harassing any student. Two days later, he submitted an affidavit of Jean Younger, one of the Law Student's classmates. Ms. Younger had hosted the party that preceded the alleged sexual activity. Ms. Younger stated (and later testified at the hearing) that at the party, the Law Student was flirting with Professor Tonkovich.

The following is Professor Tonkovich's version of the events that took place on the evening of the party. The Law Student followed him around the party for approximately five hours. She flirted with him, but he did not return her flirtations. When Professor Tonkovich left the party, she followed him out. She asked him for a ride home, claiming she was too drunk to drive. However, she did not appear too drunk to drive. He agreed to drive her home, but he was concerned that she had romantic intentions. He suggested that they go for a drive. He drove her to the campus police department parking lot where they got out and took a walk. During their walk, she attempted to kiss him. When they returned to the car, she attempted to sit in the driver's seat with him. When Professor Tonkovich said they should go, she became upset. He then drove her back to her car, dropped her off, and left. He did not have sex with her, nor did he discuss grades with her. [2]

_____

[2]As discussed below, and as alleged in Professor Tonkovich's complaint, the committee that ultimately presided over the administrative hearing did not

(continued...)

During the course of the investigation, in September 1991, Dean Jerry issued a memorandum to the Law School faculty, stating that the guidelines of the Association of American Law Schools apply to the faculty. In particular, Dean Jerry pointed out the guideline concerning the inappropriateness of a professor engaging in sexual conduct with a student enrolled in his or her class. Dean Jerry's memo stated that the guidelines were relevant to the ethics provision of the University's Faculty Code of Conduct ("Faculty Code"). The Faculty Code in effect at the time the Law Student filed her statement, and at the time of the alleged incident, did not expressly prohibit sexual relations between a professor and a student enrolled in his or her class. The Faculty Code did, however, prohibit a professor from exploiting a student for the professor's private advantage. During Professor Tonkovich's tenure, six members of the Law School faculty had dated students.

Several days after Dean Jerry issued this memo, Professor Tonkovich received Vice Chancellor Brinkman's written findings. Based on the Law Student's allegation, Vice Chancellor Brinkman found that Professor Tonkovich had violated the Faculty Code's ethics provision. Vice Chancellor Brinkman recommended a one-year paid teaching suspension for this violation. When

[2](...continued)
adopt this version of the facts.

8

Professor Tonkovich received the written findings, he was warned that repeating such behavior in the future would be cause for his dismissal from the University.

Several days later, Executive Vice Chancellor Delbert Shankel formally adopted Vice Chancellor Brinkman's written findings. Executive Vice Chancellor Shankel informed Professor Tonkovich that if past misconduct were brought to the University's attention, it might be cause for further disciplinary action. The next day, Chancellor Gene Budig adopted Executive Vice Chancellor Shankel's decision. On October 4th, Professor Tonkovich formally requested a hearing before the Committee on Tenure and Related Problems ("the Hearing Committee").

Shortly after Professor Tonkovich requested a hearing, General Counsel to the Board of Regents called the Hearing Committee's chairman, Professor William Lawrence. During their conversation, they discussed recusals from the committee. After this conversation, Professor Lawrence and two other members of the standing committee recused themselves. Three other professors were substituted. The conversation, the recusals, and the substitutions occurred without Professor Tonkovich's knowledge. Professor H. Rutherford Turnbull, III, a substituted member, became the new chairman. Other members of the Hearing Committee were Professors Nancy Ann Dahl, E.P. Johnsen, John Michel, and Delores Ringer. None of the Hearing Committee members were members of

9

the Law School faculty. Mr. Turnbull and one of the other substituted members of the Hearing Committee, Professor Dahl, eventually voted with the 3-2 majority in favor of Professor Tonkovich's dismissal.

In October 1991, a few weeks after Professor Tonkovich requested a hearing, the University's newspaper, the *University Daily Kansan*, reported that a University employee (not a party to this appeal) had referred to Professor Tonkovich as a "faggot" in his conversations with reporters. As a result of this and the publicity generated when the local television station had aired its news segment, Professor Tonkovich requested an investigation into how the information was leaked to the press. The University denied his request.

On October 31, 1991, Law School faculty members Sidney Shapiro, A. Kimberly Dayton, Reginald Robinson, Ellen Sward, Elinor Schroeder, and Sandra McKenzie signed a letter ("the Letter") asking that students report any misconduct or sexual harassment by faculty members. Professor Shapiro drafted the Letter at the request of a University administrator. The Letter did not mention Professor Tonkovich by name. After Dean Jerry approved the Letter, it was distributed to students. Professor Tonkovich did not know of the Letter or that the University was soliciting additional complaints against him. Throughout the solicitation process, various people, including Professors Shapiro and Schroeder, told others that the Law Student's allegations against Professor

Tonkovich included an allegation of rape. [3]

In December 1991, Professors Shapiro, Robinson, Dayton, and Sward met with Chancellor Budig, Executive Vice Chancellor Shankel, and Ann Victoria Thomas, University General Counsel, to discuss the case against Professor Tonkovich. During December 1991 and January 1992, some of these law professors accompanied students ("the complainants") to the University's Office of Academic Affairs, where the complainants presented allegations regarding Professor Tonkovich to University officials. Associate Vice Chancellor David Shulenburger interviewed these complainants, and, after completing the interviews, he recommended Professor Tonkovich's dismissal, which is the sanction Professor Tonkovich ultimately faced when the charging documents were filed.

Professor Tonkovich requested copies of the complainants' written statements. Executive Vice Chancellor Shankel told Professor Tonkovich that the complainants had not provided written statements. University Associate General Counsel Rose A. Marino denied having any knowledge of written statements submitted by complainants.

As the investigation progressed, in December 1991, Executive Vice

---

[3]We do not consider the Law School faculty members' argument that digital penetration constitutes rape under the law of Kansas, because that allegation is not contained within Professor Tonkovich's complaint.

11

Chancellor Shankel and Vice Chancellor Brinkman told Professor Tonkovich that if he did not "resign quietly," he would be suspended from teaching, and a letter would be placed in his file to the effect that he posed a risk of substantial harm to students. Professor Tonkovich, who had continued teaching pending his administrative hearing, refused to resign. The University placed him on teaching leave. Shortly thereafter, Executive Vice Chancellor Shankel and Vice Chancellor Brinkman communicated with Professor Tonkovich's attorney, stating that there were no terms acceptable to the University that would allow Professor Tonkovich to continue as a faculty member. Several weeks later, in March 1992, Vice Chancellor Brinkman and Dean Jerry sent Professor Tonkovich a letter, reminding him that Board of Regents regulations did not allow payment of salary when a faculty member was dismissed for moral turpitude. This letter also informed Professor Tonkovich that Vice Chancellor Brinkman and Dean Jerry were recommending that he be charged with moral turpitude, which carried a sanction of dismissal. The following day, Executive Vice Chancellor Shankel concurred in Vice Chancellor Brinkman's and Dean Jerry's recommendation.

In March 1992, Professor Tonkovich filed a complaint against various University administrators. He requested a stay in the investigation, recusal of the administrators, and appointment of independent investigators. The University denied his requests.

On April 17, 1992, Chancellor Budig filed the University's formal written complaint against Professor Tonkovich. The complaint set forth charges of ethics violations, sexual harassment, and moral turpitude. The complaint contained a proposed sanction of dismissal. One week after the University filed the complaint, the University newspaper ran an article about the Law Student's allegation against Professor Tonkovich. The article named Professor Tonkovich but did not name the Law Student.

Certain charges in the complaint were based upon allegations made by the additional student complainants. Several of the female students who were named in the allegations submitted affidavits that the allegations were false and that Professor Tonkovich had done nothing improper. These same students also submitted a letter requesting that the allegations involving them be dismissed. Nevertheless, the University prosecuted these charges.

After receiving the formal complaint, Professor Tonkovich made repeated discovery requests, including requests for written statements from the complainants, which the University initially denied. However, on July 24, 1992, the Hearing Committee ordered discovery. Although the written complainants' statements that Professor Tonkovich had requested were not disclosed at this time, Professor Tonkovich was given summaries of them. The University did not produce an alleged tape-recorded interview between University officials and the

13

Law Student that served as the basis of the article printed by the University newspaper shortly after the University filed its complaint against Professor Tonkovich. In addition, many of the University's witnesses, including the Law Student, declined to be interviewed by Professor Tonkovich's attorney prior to testifying.

On August 27, 1992, the administrative hearing concerning the University's complaint against Professor Tonkovich began. Ms. Marino prosecuted the case on behalf of the University, presenting witnesses in support of the allegations in the complaint. Professor Tonkovich was present and represented by an attorney, who cross-examined the University's witnesses and presented witnesses on Professor Tonkovich's behalf. The Hearing Committee presided. The hearing was conducted in public at Professor Tonkovich's request. The hearing lasted until May 12, 1993, with sessions held once a week during the school year.

At the hearing, during his cross-examination of one of the University's witnesses, Professor Tonkovich learned that at least one of the complainants had, indeed, provided a written statement. At Professor Tonkovich's request, the Hearing Committee sent a letter to the Law School faculty seeking any written statements. None were forthcoming. When Professor Tonkovich called Professor Dayton as a witness, she testified that she had received a written

statement from a complainant but that she had discarded it. Professor Robinson also testified that he received approximately five written statements from complainants. He further testified that he received the statements in sealed envelopes, that he never opened them, and that he later threw them away.

A week after she testified, Professor Dayton sent a letter to the Hearing Committee stating that she possessed the written statements of four complainants. She proceeded to turn these statements over to the Hearing Committee. Among them was a statement addressed to Professor Robinson. The Hearing Committee denied Professor Tonkovich's request to recall Professor Dayton as a witness.

At Professor Tonkovich's request, the Hearing Committee sent certified letters to all of the complainants who had previously testified, asking them to produce their written statements. Two of the complainants, whose allegations the Hearing Committee ultimately found to constitute Faculty Code violations, did not respond to the request, nor did they return to testify. The Hearing Committee did not compel these witnesses to return to testify, nor did it strike the earlier testimony of these complainants.

Professor McKenzie, who had openly dated a law student, declined Professor Tonkovich's request to testify at his hearing. The Hearing Committee did not compel her to testify. However, according to Professor Tonkovich, three law professors who had signed the Letter testified as "expert" witnesses on behalf

of the University: Professor Schroeder testified about sexual harassment; Professor Sward testified about faculty ethics; and Professor Shapiro testified about due process.

On the day before the Law Student was scheduled to testify, Ms. Marino proposed an evidentiary rule prohibiting counsel from inquiring about witnesses' prior sexual conduct. The Hearing Committee adopted this rule. It also adopted a sequestration rule to prevent witnesses who were scheduled to testify from hearing other witnesses' testimony. When cross-examining Ms. Younger, Professor Tonkovich's first witness, Ms. Marino asked if she had ever been sexually intimate with a professor. Ms. Marino also read a transcript of the Law Student's testimony to another University witness who was scheduled to testify.

During the 1992-93 academic year, the year in which the hearing took place, Dean Jerry gave Professor Tonkovich a negative annual evaluation and the lowest merit salary increase on the entire Law School faculty. According to Professor Tonkovich, in the previous ten years, he had received excellent evaluations and average or above average salary increases.

On May 19, 1993, one week after the hearing concluded, Andrew Ramirez, an attorney representing a University witness, sent a letter to the parties. The letter stated that his client had spoken with Mr. Turnbull several weeks after she testified at the hearing. At the conclusion of their conversation, Mr. Turnbull

16

stated to her, "I admire your courage in coming forward."

On July 30, 1993, the Hearing Committee issued its opinion. By a 3-2 vote, the Hearing Committee recommended that Professor Tonkovich be dismissed. As to the Law Student's allegation, the Committee found that she and Professor Tonkovich had engaged in a sexual act that was preceded by a discussion of grades. The Committee further found that Professor Tonkovich did not intend to intimidate the Law Student by discussing grades but that she was, nonetheless, intimidated because of the inherent power differential between a student and a professor. The committee concluded that this constituted unethical conduct in violation of the Faculty Code. The Committee also concluded that Professor Tonkovich's behavior constituted sexual harassment in violation of Title VII and Title IX and, as unlawful conduct, constituted moral turpitude under the Faculty Code.

The Hearing Committee also found that Professor Tonkovich had violated the ethical provisions of the Faculty Code with another student. This occurred when Professor Tonkovich held a female student's hand while asking her who her favorite professor was. The Committee concluded that although this conduct was unethical, it did not constitute sexual harassment. The Committee further found that Professor Tonkovich's social behavior with respect to various other law students was negligent and constituted unethical conduct under the Faculty

17

Code.

On August 3, 1993, Chancellor Budig accepted the Hearing Committee's recommendation and dismissed Professor Tonkovich. The following day, Professor Tonkovich appealed his dismissal to the Kansas Board of Regents ("the Regents"). At this time, the Regents consisted of Robert Caldwell, Tom Hammond, John Hiebert, Karen Krepps, John Montgomery, Phyllis Nolan, Frank Sabatini, and Sidney Warner. On September 15, 1994, the Regents upheld Professor Tonkovich's dismissal.

### D. Procedural History

Pursuant to the Act for Judicial Review and Civil Enforcement of Agency Actions, Kan. Stat. Ann. §§ 77-601 et seq., Professor Tonkovich had the opportunity to file an action in Kansas state district court for judicial review of the University's decision. See id. at § 77-609. However, he decided to forego this route, and on April 27, 1995, he filed suit in federal court against the University of Kansas, the University Board of Regents, and approximately thirty-four other defendants in their individual and official capacities, alleging violations of § 1983 and various state laws. In his first amended complaint, Professor Tonkovich averred three § 1983 counts (for violations of his due process, free speech, and equal protection rights), and four state law counts (for

18

breach of employment contract, breach of implied duty of good faith and fair dealing, tortious interference with business relationship, and intentional infliction of emotional distress). All defendants filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), asserting various defenses such as Eleventh Amendment immunity, absolute immunity, and qualified immunity. The district court granted in part and denied in part the defendants' motions to dismiss. We shall relate only the district court's rulings with respect to qualified immunity.

On the issue of qualified immunity, the district court treated the issues of procedural due process, free speech, and equal protection. [4] The court found that all of the individual defendants are entitled to qualified immunity on Professor Tonkovich's First Amendment free speech claim. However, the court ruled that the individual defendants are not entitled to qualified immunity on Professor Tonkovich's procedural due process and equal protection claims.

### E. Jurisdiction

Many of the defendants have attempted to appeal not only the district court's denial of their qualified immunity motions but also the district court's denial of their motions to dismiss for failure to state a claim under Fed. R. Civ. P.

---

[4]Although the district court found that Professor Tonkovich had stated a substantive due process claim, it did not address the issue of qualified immunity as it relates specifically to that claim. We shall discuss that below.

19

12(b)(6). We believe that these defendants have misunderstood this court's limited jurisdiction at this stage of the litigation. Thus, at this juncture, we embark on a brief discussion of our jurisdiction to hear this appeal.

"The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ." 28 U.S.C. § 1291. "A denial of a motion to dismiss ordinarily may not be appealed because it is not a final decision." Eastwood v. Department of Corrections, 846 F.2d 627, 629 (10th Cir. 1988). However, the denial of a motion to dismiss based on qualified or absolute immunity is immediately appealable under the Cohen[5] collateral order doctrine. See Mitchell, 472 U.S. at 530 (qualified immunity); Nixon v. Fitzgerald, 457 U.S. 731, 742 (1982) (absolute immunity). In holding the issue of immunity to be appealable under the collateral order doctrine, "the Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of the Cohen test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." Johnson v. Fankell, ____ U.S. ____, 117 S. Ct. 1800, 1804 n.5 (1997). Although to a certain extent a qualified immunity analysis overlaps with a 12(b)(6) analysis, we do not have jurisdiction to review the merits of Professor Tonkovich's lawsuit at this time. We turn, then, to a review of the district

_____

[5]Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949).

20

court's rulings with respect to qualified immunity.

## II. QUALIFIED IMMUNITY

We review de novo the denial of a motion based on qualified immunity. Walter v. Morton , 33 F.3d 1240, 1242 (10th Cir. 1994); Eastwood , 846 F.2d at 629. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ramirez v. Oklahoma Dep't of Mental Health , 41 F.3d 584, 592 (10th Cir. 1994) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982)); cf. Harris v. Board of Educ. of the City of Atlanta , 105 F.3d 591, 595 (11th Cir. 1997) ("In all but the most exceptional cases, qualified immunity protects government officials performing discretionary functions from the burdens of civil trials and from liability for damages."). The key to the qualified immunity inquiry is the "objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken." Melton v. City of Oklahoma City , 879 F.2d 706, 727 (10th Cir. 1989) (quotations omitted), modified on other grounds , 928 F.2d 920 (10th Cir. 1991).

Hearkening back to its pronouncement in Siegert v. Gilley , the Supreme

21

Court has recently stated that

> the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question.

County of Sacramento v. Lewis, ____ U.S. ____, 118 S. Ct. 1708, 1714 n. 5 (1998) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.")). Thus, we use a two-part framework to analyze the issue of qualified immunity. Latta v. Keryte, 118 F.3d 693, 697-98 (10th Cir. 1997). First, we determine whether the plaintiff has sufficiently alleged that the defendant violated a statutory or constitutional right. Id. at 698. If the answer is yes, then we determine whether the right was clearly established such that a reasonable person in the defendant's position would have known that his or her conduct violated that right. Id.[6]

---

[6] On the other hand, if the plaintiff has not sufficiently alleged the violation of a constitutional right, then we need not proceed to the second inquiry (whether the right is clearly established). See GJR Inves., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998) ("If a plaintiff has not sufficiently alleged a violation of any constitutional right, it is axiomatic that the
(continued...)

22

Ordinarily, in order for a plaintiff to demonstrate that a law is clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) (a right is clearly established if the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right.")

A plaintiff "must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." Pueblo Neighborhood Health Centers v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988). A plaintiff "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995) (quotation omitted); see also Walter, 33 F.3d at 1242 ("the

---

[6](...continued)
plaintiff likewise has failed to alleged the violation of a 'clearly established right.'") (emphasis in original); Taylor v. Meacham, 82 F.3d 1556, 1564 (10th Cir.) ("Having concluded that no constitutional right was violated, . . . we proceed no further on the qualified immunity issue."), cert. denied, 117 S. Ct. 186 (1996).

In some cases, "the threshold 'constitutional violation' analysis may run together with the 'clearly established' analysis," Derda v. City of Brighton, Col., 53 F.3d 1162, 1164 (10th Cir. 1995). In those cases, the two-part Siegart inquiry is difficult to apply. See id.

plaintiff . . . has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right."). "If the district court denies the defendant qualified immunity, the court should identify on the record the defendant's conduct that violated clearly established law." Mick v. Brewer, 76 F.3d 1127, 1134 (10th Cir. 1996) (citing Albright, 51 F.3d at 1535).

Although of necessity we must consider Professor Tonkovich's factual allegations in resolving the immunity issues, we reiterate that this appeal comes to us on a partial denial of the defendants' motions to *dismiss*, as opposed to motions for summary judgment. The district court did not, nor shall we, consider whether there is a genuine issue of material fact. Thus, we do not face the appellate jurisdictional problem that may be entangled with a qualified immunity analysis on summary judgment. Cf. Johnson v. Jones, 515 U.S. 304, 319-20 (1995) (holding that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's *summary judgment* order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial") (emphasis added). Instead, as stated above, we must accept the plaintiff's version of the facts as true. With this in mind, we proceed to analyze the issue of qualified immunity with respect to each separate cause of action under § 1983, i.e., alleged violations of procedural due process, substantive due process, and equal protection rights.

**A. Are the Defendants Entitled to Qualified Immunity on Professor Tonkovich's Procedural Due Process Claim?**

Because Professor Tonkovich was a tenured professor, he possessed a property interest deserving of procedural due process protections. Brenna v. Southern Colo. State College, 589 F.2d 475, 476 (10th Cir. 1978); see also Board of Regents v. Roth, 408 U.S. 564, 576-77 (1972). In Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 535 (1985), the Supreme Court examined the issue of "what pretermination process must be accorded a public employee who can be discharged only for cause." In deciding this issue, the Court balanced the competing interests at stake: "the private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." Id. at 542-43 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). The Court concluded that prior to termination, something less than a full evidentiary hearing is sufficient. Id. at 545. Thus, the Court held that a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. at 546.

The holding in Loudermill rested partially on the availability of a full post-termination hearing under applicable state law. Id.; see also Langley v. Adams County, Colo., 987 F.2d 1473, 1480 (10th Cir. 1993) ("Under Loudermill, the

25

adequacy of pre-termination procedures must be examined in light of available post-termination procedures."); Calhoun v. Gaines, 982 F.2d 1470, 1476 (10th Cir. 1992) (holding that "Loudermill established that some form of pretermination hearing, plus a full-blown adversarial post-termination hearing" are required when a property interest in continued employment is at stake). "A 'full post-termination hearing' is understood to include the right to representation by an attorney and the right to cross-examine adverse witnesses." Workman v. Jordan, 32 F.3d 475, 480 (10th Cir. 1994).

A fundamental principle of procedural due process is a hearing before an impartial tribunal. See Withrow v. Larkin, 421 U.S. 35, 46-47 (1975). "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." Patrick v. Miller, 953 F.2d 1240, 1245 (10th Cir. 1992) (quotation omitted). However, "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." Corstvet v. Boger, 757 F.2d 223, 229 (10th Cir. 1985). Moreover, "[b]ecause honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986) (citation omitted).

It is worth noting briefly that, in addition to being governed by

constitutional law, Professor Tonkovich's claims are also governed by 42 U.S.C.

§ 1983 itself.  Thus, Professor Tonkovich must satisfy the elements of that

statute, which states, in part,

> Every person who . . .  *subjects, or causes to be subjected* , any citizen
> . . . to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws . . . shall be liable to the party
> injured . . . .

42 U.S.C. § 1983 (emphasis added).  The plain wording of the statute contains an

element of causation.  In other words, a defendant may not be held liable under §

1983 unless he or she subjected a citizen to the deprivation, or caused a citizen to

be subjected to the deprivation.   See 1A Martin A. Schwartz & John E. Kirklin,

Section 1983 Litigation:  Claims and Defenses   § 6.3 (3d ed. 1997).

Professor Tonkovich argues that the University's policies require the

following procedural safeguards:  1) notice; 2) discovery; 3) presentation of

evidence; 4) confrontation and cross-examination; and 5) an impartial hearing

committee.  He argues that in denying him these safeguards, the defendants

violated his clearly established procedural due process rights.  At this juncture,

we shall discuss each defendant's (or defendant group's) arguments with respect

to qualified immunity on Professor Tonkovich's procedural due process claim.

**1.  Appeal of Dean Jerry (Case No. 96-3402)**

Professor Tonkovich takes issue with the following actions of Dean Jerry:

27

1) his initial handling of the Law Student's complaint; 2) his attempt to pass a rule, after the fact, prohibiting student/faculty sexual relations; 3) his denial of a request for a leak investigation; 4) his role in the settlement process; and 5) his negative annual evaluation of Professor Tonkovich. Dean Jerry argues that he is entitled to qualified immunity on Professor Tonkovich's procedural due process claim because he is not responsible for any alleged defects in the process afforded Professor Tonkovich. In other words, he argues that nothing he did violated any of Professor Tonkovich's clearly established procedural due process rights. We agree.

As for Dean Jerry's handling of the Law Student's initial complaint, Professor Tonkovich appears to argue that he did not receive proper notice of the charges against him because Dean Jerry would not immediately disclose the name of the accuser and the details of the allegation. However, Professor Tonkovich does not allege that it was Dean Jerry's duty to notify him of the charges. Moreover, Chancellor Budig did give Professor Tonkovich notice in plenty of time to prepare his defense in response to the charges.

Professor Tonkovich next argues that his procedural due process rights were violated because the dean never disclosed the "blatantly false" statements that the Law Student allegedly made to a judge for whom she worked. Aple's Brief at 60. According to Professor Tonkovich, the Law Student told the judge

28

who was her employer the following: 1) she had nonconsensual sex with her professor; 2) she told Dean Jerry about it; and 3) the Dean was not responsive. Professor Tonkovich argues that the statement the Law Student made to her employer was false because she had only told Dean Jerry that a professor had made a pass at her. We fail to see how Dean Jerry's failure to relate this conversation to Professor Tonkovich violated Professor Tonkovich's procedural due process rights. As we have discussed, Professor Tonkovich received sufficient notice of the charges against him, and, in addition, he had the opportunity to cross-examine the Law Student at his hearing.

As for the remaining allegations involving Dean Jerry, Professor Tonkovich has failed to explain how any of them might constitute a denial of his procedural due process rights. That is, he has failed to demonstrate how attempting to pass a new faculty code rule, denying a request for a leak investigation, taking part in settlement negotiations, and rendering an unfavorable annual evaluation had anything to do with whether Professor Tonkovich received the process that he was due–notice, an explanation of the charges against him, and an opportunity to respond. Nor has Professor Tonkovich pointed to any clearly established law that stands for the proposition that the sorts of actions taken by Dean Jerry might form the basis of a procedural due process claim. For these reasons, we conclude that the district court erred in

29

denying Dean Jerry's motion to dismiss Professor Tonkovich's procedural due process claim on qualified immunity grounds.

### 2. Appeal of Regents (Case No. 96-3403) and Hearing Committee (Case No. 96-3404) [7]

The Regents and the Hearing Committee members argue that because Professor Tonkovich failed to exercise his right to judicial review he should not now be heard to complain of the violation of his procedural due process rights. In other words, they argue that because Professor Tonkovich was entitled to seek judicial review of the University's decision under Kansas law, Kan. Stat. Ann. § 77-601 et seq., the state provided even more process than an administrative hearing and an appeal to the Board of Regents. Thus, they argue, his procedural due process claim must fail.

We reject the argument that Professor Tonkovich's failure to seek judicial review in state court precludes his procedural due process claim. It is beyond dispute that a plaintiff need not exhaust state administrative remedies before filing suit in federal court under § 1983. Patsy v. Board of Regents, 457 U.S. 496, 516 (1982). However, as we shall discuss below, the availability of an

---

[7]Case No. 96-3403, the appeal filed by the Board of Regents, and Case No. 96-3404, the appeal filed by the Hearing Committee, were consolidated for briefing purposes; therefore, in the ensuing discussions, we shall treat those two cases as one separate appeal.

action for judicial review is relevant to the question of what process the state afforded Professor Tonkovich.

Professor Tonkovich argues that the Regents and the Hearing Committee members denied him his procedural due process right to an impartial tribunal. He also takes issue with the Hearing Committee members' failure to: 1) order discovery; 2) compel witnesses to appear and testify; and 3) mention evidence favorable to him in their findings. We shall address each contention in turn.

Professor Tonkovich first argues that he was denied the right to an impartial tribunal because the Hearing Committee members were not professional hearing officers, they were employed by the University, and they were subordinates of the Chancellor. Furthermore, he argues that the fact that various members of the standing committee recused themselves, and that other members were substituted, demonstrates that the resulting Hearing Committee was biased. In support of this claim, he points to Mr. Turnbull's statement to a witness to the effect that he admired her courage in coming forward to testify.

First of all, while the Due Process Clause certainly requires a hearing before an impartial tribunal, Professor Tonkovich has pointed to no law, clearly established or otherwise, that procedural due process includes a right to professional hearing officers or hearing officers not employed by the governmental body or agency taking the adverse action. As to the recusals, one

31

of the substituted Hearing Committee members, Mr. Michel, actually voted against Professor Tonkovich's dismissal. This alone takes the wind out of the sails of Professor Tonkovich's recusal argument. Furthermore, even assuming Mr. Turnbull stated to a witness, "I admire your courage in coming forward," that does not establish the required "substantial showing of personal bias." Corstvet , 757 F.2d at 229.

The Hearing Committee members argue that there is nothing indicating that they had a personal or financial stake in the decision, which might create a conflict of interest, nor are there sufficient allegations to support charges of personal animosity on the part of its members. See Hortonville Joint Sch. Dist. Number 1 v. Hortonville Educ. Ass'n , 426 U.S. 482, 491-92, 496 (1976) (basing, in part, its holding that school board dismissing striking teachers did not violate Due Process Clause on fact that these indicia of bias were lacking). In short, they argue that Professor Tonkovich's complaint contains only conclusory allegations of bias, without alleging factual support. We agree. We simply do not think that Professor Tonkovich has sufficiently alleged personal bias requiring disqualification of the Hearing Committee members under the Due Process Clause.

As to the Regents, Professor Tonkovich similarly levels accusations of bias against them. He argues that the Regents' bias violated his procedural due

process rights. In support of this argument, he states that the Regents made erroneous and prejudicial decisions and that they deferred to the findings of the Hearing Committee. As with the Hearing Committee, these conclusory assertions are insufficient to allege bias constituting a violation of Professor Tonkovich's procedural due process rights.

Professor Tonkovich next takes issue with what he claims is the Hearing Committee's failure to order discovery. He claims that this led to a denial of his right to cross-examine the witnesses against him. In particular, he argues that he never was able to discover a tape-recording of an alleged interview between the Law Student and University administrators. This, he argues, amounted to a denial of his right to cross-examine the Law Student.

Furthermore, Professor Tonkovich argues that he was unable to discover all of the statements that various complainants had submitted during the investigation. As he points out, the Hearing Committee specifically requested, through certified return-receipt mailings, that the complainants produce their statements and return to testify. However, two of the complainants neither produced their statements nor returned to testify. Thus, he argues, he was denied the right to cross-examine these two complainants. Professor Tonkovich also complains that all of the complainants, including the Law Student, refused to allow Professor Tonkovich's attorney to interview them prior to the hearing.

First of all, we note that the Hearing Committee ultimately did order discovery prior to Professor Tonkovich's administrative hearing. The fact that Professor Tonkovich was unable to discover every piece of evidence is of no consequence as a matter of procedural due process. The Due Process Clause does not guarantee that parties to an adversarial proceeding may discover every piece of evidence they desire. Indeed, civil litigants in federal court do not have a claim for a violation of their Fourteenth Amendment rights every time a federal district judge or a federal magistrate rules against them in a discovery dispute.

Furthermore, Professor Tonkovich has not adequately alleged that he was denied the right to cross-examine adverse witnesses. As we have discussed, he had notice of the charges, and of his accusers, well before the hearing. He was able to cross-examine each of them, albeit not in exactly the way he would have liked. On these facts, we cannot say that the cross-examinations violated Professor Tonkovich's procedural due process rights simply because he did not have access to several of the witnesses' prior statements. As his complaint admits, the University did provide him with summaries of the complainants' statements. Importantly, Professor Tonkovich has also cited no clearly established legal authority for the proposition that the Due Process Clause requires that he be allowed to interview adverse witnesses prior to a hearing.

Professor Tonkovich next argues that the Hearing Committee members

34

violated his procedural due process rights by failing to compel the return of various witnesses who had previously testified. The Hearing Committee members argue that they did not have the authority to compel the attendance of witnesses. They did, however, attempt to assist Professor Tonkovich with the re-appearance of witnesses by sending certified return-receipt mail, as Professor Tonkovich himself acknowledges in his complaint. Professor Tonkovich has cited no law, clearly established or otherwise, which states that an administrative tribunal runs afoul of the Due Process Clause for its failure to compel the attendance of witnesses when it lacks subpoena power. See Workman, 32 F.3d at 480 (stating that, under the facts of that case, "[t]he lack of subpoena power available to the plaintiff or the unavailability of some witnesses does not . . . create unconstitutional process."). Even if the Hearing Committee did have subpoena power, a reasonable person in the place of a Hearing Committee member would not know that he or she was violating someone's procedural due process rights for failing to compel the appearance of witnesses under these circumstances.

Professor Tonkovich next argues that the Hearing Committee should have mentioned in its findings various pieces of evidence favorable to his side of the case. For example, Professor Tonkovich takes issue with the Hearing Committee's failure to mention the discrepancy between what the Law Student

35

told the judge who employed her and what she told Dean Jerry. Professor Tonkovich claims that the Committee's failure to mention such evidence violated his procedural due process rights. We disagree. The Hearing Committee handed down extensive findings and conclusions after a hearing spanning approximately nine months. Under the circumstances, the fact that the Committee did not mention every possible fact in its resolution of the case does not implicate due process.

Professor Tonkovich also claims that the Hearing Committee itself admitted that the proceedings against him were unfair because it recommended additional procedures for future disciplinary proceedings. Taking into consideration the procedures afforded Professor Tonkovich, the fact that the Hearing Committee members made recommendations concerning future disciplinary proceedings does not convince us that they violated his procedural due process rights.

In sum, the Regents and the Hearing Committee members argue that under Loudermill , Professor Tonkovich was entitled only to notice of the charges, an explanation of the evidence against him, and an opportunity to respond. They argue that the allegations in Professor Tonkovich's own complaint establish that he received this and much more. We agree. Therefore, the district court erred in denying the motion to dismiss Professor Tonkovich's procedural due process

claim against the Regents and the Hearing Committee members on the basis of qualified immunity.

### 3.  Appeal of Professor McKenzie (Case No. 96-3405)

The only allegations against Professor McKenzie in particular were that she signed the Letter, she refused to testify, and she dated a student.  None of these allegations, she argues, are sufficient to establish that she violated a constitutional right.  We agree.

As we shall discuss at length below, when the Law School faculty members signed the Letter, they did not thereby violate Professor Tonkovich's procedural due process rights.  As to the remaining allegations against Professor McKenzie–that she refused to testify on Professor Tonkovich's behalf and that she dated a student–we fail to see how these might form the basis of a procedural due process claim.  Professor McKenzie neither subjected Professor Tonkovich, nor caused Professor Tonkovich to be subjected, to the deprivation of his procedural due process rights.  Thus, the district court erred in denying her motion to dismiss the procedural due process claim on qualified immunity grounds.

### 4.  Appeal of the University General Counsel (Case No. 96-3406)

The specific allegations against General Counsel Thomas are that she gave an opinion as to the applicability of the University's statute of limitations, and she attended two meetings to discuss Professor Tonkovich's case. Essentially, he seems to be complaining that she did her job. Ms. Thomas argues that neither of these actions can be said to have violated Professor Tonkovich's procedural due process rights. We agree.

The allegations against Associate General Counsel Marino, who prosecuted the case on behalf of the University, are that she denied the existence of the complainants' statements and that she violated two of the Hearing Committee's evidentiary rulings. Specifically, she asked a witness about her sexual involvement with law professors, and she read a portion of the Law Student's testimony to another witness who was scheduled to testify. Associate General Counsel Marino argues that even if some of these actions constituted infractions of a University policy or rule, this is not enough to rise to the level of a deprivation of a federal constitutional right.

We note that a university's failure to follow its established guidelines in overseeing a grievance "does not in and of itself implicate constitutional due process concerns." Purisch v. Tennessee Tech. Univ., 76 F.3d 1414, 1423 (6th Cir. 1996); cf. Jones v. City and County of Denver, 854 F.2d 1206, 1209 (10th Cir. 1988) (a violation of state law, by itself, does not rise to the level of a

federal constitutional deprivation, and, thus, is not cognizable under § 1983).
The federal courts, and not the University of Kansas, are responsible for
establishing the contours of the Due Process Clause of the Fourteenth
Amendment. Thus, even taking Professor Tonkovich's allegations against Ms.
Marino as true, as we must, we do not think they are sufficient to establish the
violation of his procedural due process rights. While Ms. Marino's failure to
adhere to certain evidentiary rules was perhaps not a model of prosecutorial
conduct, nothing that she did changes the fact that Professor Tonkovich received
notice, an opportunity to be heard by an impartial tribunal, and various post-
termination remedies. Accordingly, we conclude that the district court erred in
denying Ms. Thomas's and Ms. Marino's motion to dismiss the procedural due
process claim on qualified immunity grounds.


### 5. Appeal of Law School Faculty Members (Case No. 96-3407)

The Law School faculty members argue that they were not even in a
position from which they could afford or deny procedural protections to
Professor Tonkovich. Thus, they argue, they cannot be said to have violated his
due process rights. We disagree with the notion that a faculty member, by virtue
of his or her position within a university, may never effect a procedural due
process violation. However, in this case, nothing the Law School faculty

39

members did caused a deprivation of Professor Tonkovich's procedural due process rights.

The specific allegations against the Law School faculty members are as follows: 1) they signed the Letter soliciting additional complaints; 2) they met with University administrators to discuss the case; 3) they accompanied students who submitted complaints to administrators; 4) two of them stated they heard that the Law Student's complaint contained an allegation of rape; 5) some of them refused to disclose, and one of them intentionally destroyed, complainant statements; and 6) they testified as witnesses at Professor Tonkovich's hearing. The faculty members argue that Professor Tonkovich has failed to point to any clearly established law that stands for the proposition that any of these actions might form the basis of a procedural due process claim.

We shall first address the Law School faculty members' role in authoring, signing, and distributing the Letter, which Professor Tonkovich continually refers to as the "secret" solicitation process. See, e.g., Aple's Brief at 7, 31, 43. Professor Tonkovich cites no clearly established Tenth Circuit or Supreme Court precedent standing for the proposition that when a university is investigating a complaint of sexual misconduct against a professor, the university must disclose, during the investigatory process, every complaint it solicits and the means it uses to solicit those complaints. In fact, there is precedent in this circuit that arguably

40

supports a contrary proposition.

In Derstein v. Kansas , 915 F.2d 1410 (10th Cir. 1990), the plaintiff, a tenured court employee who could be terminated only for just cause, was fired after an investigation revealed that he had sexually harassed various fellow employees. The plaintiff was told neither that an investigation was underway nor that complaints against him were being solicited. A court personnel officer conducted the investigation by tape-recording interviews with various court employees and then transcribing the tapes.

After the investigation was complete the plaintiff was told that he would have ten days to resign or be terminated. Id. at 1412. He was also advised that he could appeal the decision and that a hearing would be afforded at that time. At the end of the ten-day period, the plaintiff received a termination letter, which specified the nature of the charges against him and his right to appeal. The plaintiff filed an administrative appeal, which was denied as frivolous. At no time during the administrative proceedings did the employer provide the plaintiff with transcripts of the tape-recorded interviews. Id.

The plaintiff then filed a § 1983 action. After a bench trial, the district court held that the pretermination proceedings deprived the plaintiff of a property interest without due process of law. Id. at 1411. We reversed, holding that the pretermination procedures comported with Loudermill 's requirements. Id. at

41

1413. We stated that the fact that the plaintiff "may not have known in advance about [the personnel officer's] internal investigation [and that he] did not receive more facts or a copy of the transcript at the pretermination hearing is not significant." Id. at 1413. Likewise, in the case at bar, the fact that University administrators conducted an investigation without Professor Tonkovich's knowledge does not implicate procedural due process because he ultimately received notice of the charges and a meaningful opportunity to respond in the hearing that took place over a period of nine months.

We noted that the plaintiff in Derstein never contested the factual basis for the sexual harassment charges, i.e., he did not deny that the conduct occurred. Under those circumstances, we held that the appeal to an appeals board constituted a sufficient post-termination procedure, even though the appeals board did not grant the plaintiff a full evidentiary hearing. We found that this post-termination proceeding, in combination with the pretermination procedures, afforded the plaintiff all of the process he was due. In Professor Tonkovich's case, he obviously did contest the factual basis for the charges against him; however, he also received a full-blown evidentiary hearing. The fact that University officials and faculty members did not keep Professor Tonkovich apprised every step along the way of the investigation does not amount to a violation of his procedural due process rights.

42

Professor Tonkovich next complains that when the Law School faculty members met with University administrators to discuss his case, and when they accompanied the complainants to meet with administrators, they violated his procedural due process rights. We fail to see how either of these actions might form the basis of a procedural due process claim in the absence of allegations that these actions interfered with Professor Tonkovich's receiving notice of the charges or with his ability to respond to those charges. Professor Tonkovich has not cited any law, clearly established or otherwise, that would support the proposition that in taking part in the investigation as the Law School faculty members here did, their actions ran afoul of the Due Process Clause.

Next, Professor Tonkovich argues that two of the Law School faculty members violated his procedural due process rights when they repeated information they had heard, namely, that the allegations against Professor Tonkovich included an allegation of rape. Assuming, as we must, that the allegation is false, it still does not implicate procedural due process. [8] While the statements may be actionable under state tort law, they do not rise to the level of depriving Professor Tonkovich of federal procedural due process rights. There is no allegation that the statements made by the professors had anything to do with

---

[8] We shall discuss the allegation of rape with respect to Professor Tonkovich's liberty interest below.

whether Professor Tonkovich received notice of the charges against him or had a meaningful opportunity to respond, which is what procedural due process requires.

Finally, Professor Tonkovich takes issue with the Law School faculty members' role in testifying at his hearing and in discarding or denying the existence of the written complainant statements. Once again, he cites no clearly established law that stands for the proposition that taking such actions implicates procedural due process. As we have discussed, Professor Tonkovich received summaries of the statements, and he was able to cross-examine the complainants; therefore, the fact that several professors were not forthcoming with written statements does not amount to a violation of Professor Tonkovich's procedural due process rights. Although such conduct on the part of the professors is not to be lauded, it simply does not rise to a level sufficient to implicate procedural due process concerns. Furthermore, we fail to see how the professors' acts in testifying at Professor Tonkovich's hearing–and thereby being subjected to cross-examination–violated his procedural due process rights. For all of these reasons, the district court should have granted the Law School faculty members' motion to dismiss the procedural due process claim on qualified immunity grounds.

**6. Appeal of the Chancellor's Office (Case No. 96-3408)**

The Chancellor's office staff members argue that they are entitled to qualified immunity on Professor Tonkovich's procedural due process claim because Professor Tonkovich received all of the process he was due. Furthermore, they argue that Professor Tonkovich failed to show that any of their actions constituted violations of a clearly established right.

The specific allegations against staff members of the Chancellor's office are as follows: 1) they extended the investigation after having set a deadline for filing complaints against Professor Tonkovich; 2) Vice Chancellor Brinkman and Executive Vice Chancellor Shankel at first recommended a one-year paid suspension, but as the investigation progressed, they increased the proposed sanction to dismissal; 3) Associate Vice Chancellor Shulenberger interviewed the complainants; 4) Executive Vice Chancellor Shankel denied that the complainants had submitted written statements; 5) during settlement negotiations, Vice Chancellor Brinkman and Executive Vice Chancellor Shankel recommended that Professor Tonkovich resign quietly, and they stated that there were no terms acceptable to the University for Professor Tonkovich to continue as a faculty member; and 6) Chancellor Budig prosecuted charges even after several students stated that the charges were groundless.

Professor Tonkovich's argument that extending the investigation and increasing the proposed sanction violated his procedural due process rights must

fail. Neither the length of the investigation nor the decision to increase the proposed sanction deprived Professor Tonkovich of his rights to notice and an opportunity to respond. It is not as if the sanction he faced was changed during the course of or after his hearing. Well before his hearing began, he understood that he faced dismissal from the Law School faculty. Additionally, the fact that Professor Tonkovich initially responded in writing to the Law Student's charges, when he faced only suspension, is not significant because that was not his only opportunity to respond. Ultimately, after the investigation was complete, he was informed of all of the charges against him and given ample opportunity to respond to all of them.

Professor Tonkovich next argues that Associate Vice Chancellor Shulenberger violated his procedural due process rights when he interviewed the complainants. Professor Tonkovich wholly fails to allege how these interviews deprived him of his rights to notice or an opportunity to respond. Furthermore, he cites no clearly established law standing for the proposition that during the course of an investigation of a university professor, a university administrator violates the professor's procedural due process rights by interviewing students with complaints.

Next Professor Tonkovich complains of Executive Vice Chancellor Shankel's denial of the existence of written complainant statements. We have

46

already discussed the failure to reveal the complainants' statements in the context of the Hearing Committee, Ms. Marino, and the Law School faculty members. For similar reasons, the fact that Executive Vice Chancellor Shankel denied that the complainants had submitted written statements does not implicate Professor Tonkovich's procedural due process rights. Although such conduct on the part of any university employee is not to be commended, it does not rise to the level of a constitutional violation. As previously discussed, the University provided summaries of the statements prior to his hearing, and Professor Tonkovich had the opportunity to cross-examine each of the complainants.

Professor Tonkovich next argues that Vice Chancellor Brinkman and Executive Vice Chancellor Shankel violated his procedural due process rights when they took part in settlement negotiations. Specifically he points to their actions in recommending that he resign quietly and in stating that there were no terms acceptable to the University for Professor Tonkovich to continue as a faculty member. Professor Tonkovich fails to allege, however, how these actions caused the deprivation of his procedural due process rights. He does not allege, for example, that in pressuring him to resign quietly or in stating that there were no acceptable terms to the University, Vice Chancellor Brinkman and Executive Vice Chancellor Shankel somehow prevented him from receiving notice of the charges against him or an opportunity to respond.

47

Finally, Professor Tonkovich argues that Chancellor Budig violated his procedural due process rights by including in the formal complaint allegations that several law students thought were groundless. We fail to see how this implicates Professor Tonkovich's procedural due process rights in the absence of an allegation that he was not given notice of these charges or an opportunity to respond to them. It is hardly the role of a law student to decide which allegations to include in a charging document against a faculty member. Professor Tonkovich was free to call these students as witnesses in his defense, and his complaint indicates that these students did submit affidavits stating their positions. For all of these reasons, the district court erred in denying the motion to dismiss the procedural due process claim against the staff members of the Chancellor's office on qualified immunity grounds.

After considering the arguments of the parties, we turn our attention briefly to the district court's disposition of the qualified immunity issue as it relates to Professor Tonkovich's procedural due process claim. The district court concluded that Professor Tonkovich's hearing was a combined pre- and post-termination hearing. Aplts' App. vol. IV, doc. 18 at 1345-46. However, Professor Tonkovich was not dismissed until *after* the hearing was complete and the Hearing Committee handed down its findings and conclusions. During the

48

course of his hearing, although he was on teaching leave, his employment with the University had not been terminated. Thus, we think the district court was technically incorrect on this point. The evidentiary hearing was, in actuality, a pretermination hearing that afforded Professor Tonkovich more process than he was due prior to being terminated. In addition, the district court failed to consider that Professor Tonkovich had the opportunity to appeal to the Board of Regents and then, finally, to file an action for judicial review in state district court.

A state court proceeding for judicial review of the University's action would have afforded Professor Tonkovich the opportunity to present evidence as to the alleged "unlawfulness of [the] procedure or of [the] decision-making process." See Kan. Stat. Ann. § 77-619(a)(2). Furthermore, on judicial review, the state district court would have had the power to order the University to take a specific action, enjoin the University from enforcing an action, or render appropriate declaratory relief. See id. at § 77-622(b). Although, as we have stated, exhaustion is not a prerequisite to bringing a § 1983 claim, the fact that Professor Tonkovich did have the opportunity for an additional post-termination hearing, regardless of whether he exercised this right, is germane to our inquiry into what process the state afforded him.

The district court further concluded that the individual defendants were not

entitled to qualified immunity in part because Professor Tonkovich received inadequate notice of the charges against him due to the fact that the University increased the stakes as the investigation progressed. We think this conclusion is incorrect for at least two reasons. First of all, the fact remains that approximately four months before the hearing, the University filed a written complaint against Professor Tonkovich. Thus, well in advance, the Chancellor informed Professor Tonkovich in writing as to the charges and the penalty he faced. Second, the district court failed to consider which of the individual defendants was responsible for giving Professor Tonkovich notice of the charges. Surely, for example, the Law School faculty members cannot be said to have violated Professor Tonkovich's procedural due process rights by failing to give him notice of the charges, because they had no duty to give him notice; moreover, none of their actions deprived him of notice.

As we have stated, under Loudermill, before he was terminated, Professor Tonkovich was entitled to notice, an explanation of the charges against him, and an opportunity to respond. Professor Tonkovich's own complaint reflects that, prior to his termination, he received these protections and much more. A full-blown evidentiary hearing clearly meets the dictates of Loudermill. Taking into consideration Professor Tonkovich's pretermination hearing, in combination with the various post-termination proceedings afforded by the state, we conclude that

Professor Tonkovich was afforded all of the process that he was due, and perhaps more than what Loudermill requires.

Because we have found that Professor Tonkovich received all of the process that he was due, we must reject his claim for deprivation of a liberty interest, as well. In order to demonstrate the infringement of a liberty interest in one's good name, one must show that: 1) the defendant made a statement impugning his or her good name, reputation, honor, or integrity; 2) the statement was false; 3) the defendant made the statement in the course of termination proceedings or the statement foreclosed future employment opportunities; and 4) the statement was published. Workman, 32 F.3d at 481 (internal citations omitted). In such a case, the Due Process Clause requires an adequate name-clearing hearing. Id. at 480. We acknowledge that Professor Tonkovich did, indeed, have a liberty interest in his reputation, deserving of due process protection. However, even if the University infringed that interest, when, for example, two of the faculty members stated that they heard that the Law Student accused Professor Tonkovich of rape, we conclude that the University provided him with an adequate name-clearing hearing. Thus, there is perhaps a tort claim, but there is no constitutional violation. [9]

---

[9]We express no opinion as to whether the professors' statements did, indeed, infringe Professor Tonkovich's liberty interest. As we have already

(continued...)

After carefully considering Professor Tonkovich's allegations, the defendants' arguments, and the relevant law, we hold that the individual defendants are entitled to qualified immunity on Professor Tonkovich's procedural due process claim. We do not necessarily condone each of the procedures that the University followed in the course of Professor Tonkovich's disciplinary proceedings. Nevertheless, as we have discussed, every alleged procedural error does not necessarily implicate due process. Although Professor Tonkovich may or may not have valid claims based on violations of state law, he has failed to meet his burden on qualified immunity as it relates to his federal procedural due process claim. We turn now to a discussion of Professor Tonkovich's substantive due process claim.

## B. Are the Defendants Entitled to Qualified Immunity on Professor Tonkovich's Substantive Due Process Claim?

At the outset, we must address the district court's supposed failure to consider the defendants' entitlement to qualified immunity on Professor Tonkovich's substantive due process claim. The district court stated that after an

---

[9](...continued)
noted, in order to infringe one's liberty interest, the defendant must, among other things, make a *false* statement impugning the plaintiff's reputation. See Workman, 32 F.3d at 481. At this stage, we are constrained to accept Professor Tonkovich's version of the facts.

52

extensive review of the record, it could not "locate the individual defendants' argument that they are entitled to qualified immunity on plaintiff's substantive due process claim." Aplts' App. vol. IV, doc. 18 at 1350. Therefore, the court stated that it was declining to address the issue. Id.

Although all of the defendants filed motions to dismiss Professor Tonkovich's due process claim based on qualified immunity, they did not separately address substantive due process. However, they all argued, in more or less general terms, that they are entitled to qualified immunity because Professor Tonkovich failed to allege specific facts showing that they had violated *any* clearly established constitutional right of which a reasonable person would have known. See, e.g., Aplts' App. vol. I, doc. 3 at 172 (plaintiff's failure to allege that Hearing Committee members violated clearly established right entitles them to qualified immunity); id., doc. 4 at 216-17 (plaintiff's failure to identify clearly established right entitles Board of Regents to qualified immunity); id., doc. 5 at 248 (doctrine of qualified immunity bars suit against Law School faculty members because their conduct had no effect on plaintiff's constitutional rights); id. vol. II, doc. 7 at 679 (Dean Jerry entitled to qualified immunity because his actions did not violate clearly established constitutional rights); see also id. vol. III, doc. 9 at 996 (plaintiff's failure to allege that Chancellor's office staff members violated clearly established due process rights entitled them to qualified

immunity).

Our review of count one of Professor Tonkovich's first amended complaint indicates that Professor Tonkovich himself did not delineate his due process claim as containing both a procedural and a substantive component. On the contrary, count one is entitled "42 U.S.C. Section 1983 (Fourteenth Amendment Due Process)." Id. vol. I, doc. 1 at 79. Nowhere in his complaint does Professor Tonkovich argue that the defendants violated his substantive due process rights. He simply refers to "due process," which, under the circumstances, the defendants could reasonably interpret in various ways. Professor Tonkovich has the burden to identify the rights that he alleges the defendants violated. See Walter, 33 F.3d at 1242. Thus, the defendants should not be required to guess whether Professor Tonkovich pled a substantive due process claim, a procedural due process claim, or both.

At this stage of the litigation, Professor Tonkovich argues that his substantive due process claim is based on the allegation that he did not have fair warning of prohibited conduct and is further based "on the defendants' other arbitrary and wrongful actions." Aple's Brief at 36. However, Professor Tonkovich did not articulate his "no fair warning" argument before the district court in his response to the defendants' motions to dismiss. Instead, he argued that his substantive due process claim was based on the fact that the defendants

54

had deprived him of liberty and property. Aplts' App. vol. III, doc. 10 at 1102-03. Such an argument applies equally in the procedural due process arena as it does in the substantive, for there can be no violation of one's procedural due process rights without a deprivation of life, liberty, or property. See U.S. Const. amend. XIV, § 1. Moreover, in the portion of his response addressing substantive due process, Professor Tonkovich referred to the defendants denying him an impartial tribunal, arguably a procedural due process topic, rather than a substantive one. Aplts' App. vol. III, doc. 10 at 1103.

Our point here is that Professor Tonkovich's substantive due process claim lacked crisp contours during the district court proceedings. And even now, as mentioned above, Professor Tonkovich argues that his substantive due process claim is based, in part, on a host of allegedly arbitrary and wrongful actions of the defendants, some of which implicate procedural due process concerns. Because of the overlap inherent in the way Professor Tonkovich pled his due process claim, we think that the district court read the defendants' motions to dismiss too narrowly. In other words, we think that the defendants' motions to dismiss on the basis of qualified immunity were sufficient to put the district court on notice that they were asserting the affirmative defense of qualified immunity with respect to Professor Tonkovich's entire § 1983 due process claim. Furthermore, because the substantive due process claim is based, in part, on

55

allegedly arbitrary actions that may be fairly characterized as implicating procedural due process rights, we think the district court's treatment of the due process claim with respect to qualified immunity is of sufficient breadth to allow us to review the issue of qualified immunity as it relates specifically to substantive due process. We turn now to that portion of our task.

Because Professor Tonkovich was a tenured professor, the law in this Circuit is that he possessed "a property interest deserving of . . . substantive protections of the Fourteenth Amendment." Brenna, 589 F.2d at 476. Substantive due process requires that the termination of a tenured professor's property interest not be "arbitrary, capricious, or without a rational basis." Id. at 477. The Supreme Court has "emphasized time and again that [t]he touchstone of due process is protection of the individual against arbitrary action of government . . . ." Lewis, 118 S. Ct. at 1716 (quotation omitted).

In Uhlrig v. Harder, 64 F.3d 567 (10th Cir. 1995), we stated that "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" Id. at 573 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992)) (quotation omitted). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by

56

abusing or misusing government power." Uhlrig, 64 F.3d at 574. Instead, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Id. We acknowledged that "[t]he level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct." Id.

Recently, the Supreme Court reaffirmed the "shocks the conscience" test in Lewis, 118 S. Ct. 1708, which involved a substantive due process claim brought under § 1983 against a municipality after a high-speed police chase killed a sixteen-year-old boy. The Court noted that "[w]hile due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." Id. at 1716 (citations omitted). The Court went on to state that "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." Id. at 1717. Accordingly, when a plaintiff brings a substantive due process challenge to executive action, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. at 1717 n.8.

57

Professor Tonkovich argues that the "shocks the conscience" standard does not apply to this case because the defendants' conduct was intentional. He argues that the defendants' actions should be measured instead against a generic standard of arbitrariness. However, in the alternative, he argues that the defendants' conduct was, indeed, shocking to the conscience.

There is some indication that the "shocks the conscience" standard and the "arbitrariness" standard are used interchangeably. See, e.g. Collins, 503 U.S. at 128 (stating that the Court is not persuaded that the defendants' actions "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense"). Justice Scalia's reading of the majority opinion in Lewis is that the shocks-the-conscience test "is the *measure* of arbitrariness when what is at issue is executive rather than legislative action." Lewis, 118 S. Ct. at 1724 (Scalia, J., concurring) (emphasis in original). In any event, we express no opinion on whether the "shocks the conscience" standard applies to this case because regardless of whether we use that standard or we simply inquire whether the defendants' actions were arbitrary or lacking a rational basis, the defendants are entitled to qualified immunity on Professor Tonkovich's substantive due process claim. As we shall discuss in greater detail below, the defendants' actions were not arbitrary, did not lack a rational basis, and were not shocking to the conscience.

58

As we have discussed, Professor Tonkovich claims that the defendants violated his substantive due process rights by their failure to warn him of prohibited conduct and by their other arbitrary and wrongful actions. At this juncture, we shall discuss each defendant's (or defendant group's) arguments with respect to qualified immunity on Professor Tonkovich's substantive due process claim.

## 1. Appeal of Dean Jerry (Case No. 96-3402)

Professor Tonkovich argues that Dean Jerry violated his substantive due process rights because the memorandum he issued to faculty falsely asserted that student/faculty sex was unethical under the Faculty Code. Furthermore, Professor Tonkovich argues, Dean Jerry violated his substantive due process rights by proposing a rule, with retroactive application, prohibiting sexual relations between professors and students enrolled in their courses. Since the Law School faculty did not approve Dean Jerry's proposed rule, the argument goes, Professor Tonkovich was arbitrarily charged with violating a nonexistent rule. In response, Dean Jerry argues that Professor Tonkovich did indeed have fair warning that his conduct was prohibited because at the time he allegedly engaged in a sexual act with one if his students after discussing law school grades with her, it was clearly unethical, under existing University policy, for a

professor to exploit a student for his own private advantage.

We acknowledge that the allegations against Professor Tonkovich required Dean Jerry and other University officials to confront a difficult question: when does sexual contact between participants in an unequal power relationship become exploitative? However, the fact that reasonable minds might not agree with the way in which the majority of the Hearing Committee, the Chancellor, and the Regents resolved that question is insufficient to support a substantive due process claim.

In this regard, we note that the Seventh Circuit has rejected a claim similar to Professor Tonkovich's claim that he did not have fair warning that his conduct was prohibited. In Korf v. Ball State Univ., 726 F.2d 1222 (7th Cir. 1984), a tenured professor who allegedly sexually harassed various students filed a § 1983 suit after he was discharged from the faculty. He alleged that his substantive due process rights were violated because he did not have adequate notice that consensual sexual relations between faculty members and students were prohibited. Id. at 1226. The court noted that, after an investigation and a hearing, a committee found that the plaintiff had engaged in unethical behavior by exploiting students for his private advantage. Thus, consensual sexual relations were not at issue. The court stated that "[c]ommon sense, reason and good judgment should have made [the plaintiff] cognizant of the fact that his

60

conduct could and would be cause for termination." <u>Id.</u> at 1227. Likewise, in the case at bar, if common sense, reason, and good judgment were not adequate to notify Professor Tonkovich, certainly the Faculty Code's prohibition against exploiting students concretely notified him that he could be terminated for having sex with one of his students after discussing her grades.

Next, Professor Tonkovich argues that Dean Jerry violated his substantive due process rights by initially withholding the name of Professor Tonkovich's accuser and the nature of the accusation. However, Professor Tonkovich has cited no law, and certainly no clearly established law, supporting his argument that he had a substantive due process right to know the name of his accuser on the day she lodged her complaint. Furthermore, as we have discussed, Professor Tonkovich knew the name of his accuser and the nature of her allegation well before he had the opportunity to cross-examine her.

Finally, Professor Tonkovich argues that Dean Jerry violated his substantive due process rights by giving him an unearned negative annual evaluation and the lowest merit salary increase on the entire law school faculty. In light of the fact that Professor Tonkovich was embroiled in a scandal involving sexual misconduct with one of his students, we cannot say that Dean Jerry's action in this respect was completely arbitrary or irrational. Professor Tonkovich certainly has not cited any clearly established law that would lead us

61

to such a conclusion. For these reasons, the district court erred in denying Dean Jerry's motion to dismiss the substantive due process claim on qualified immunity grounds.

### 2. Appeal of Regents (Case No. 96-3403) and Hearing Committee (Case No. 96-3404)

Professor Tonkovich argues that the Regents and the Hearing Committee members violated his substantive due process rights by making erroneous findings that he engaged in unethical conduct. Furthermore, he argues, they violated his substantive due process rights by voting for his dismissal, a sanction that he claims lacks a rational basis.

The Regents and the Hearing Committee members argue that the fact that they did not agree with Professor Tonkovich on every issue and did not ultimately find in his favor cannot form the basis of a substantive due process claim against them. They argue that even assuming, for purposes of argument, their decisions in finding that he committed the charged conduct and voting for his dismissal were wrong, these actions do not rise to the level of a substantive due process violation. We agree. Indeed, "[t]he Due Process Clause is not a guarantee against incorrect or ill-advised personnel decisions." Collins, 503 U.S. at 129 (quotation omitted). For these reasons, the district court erred in denying

the Regents' and the Hearing Committee members' motions to dismiss the substantive due process claim on qualified immunity grounds.

### 3. Appeal of Professor McKenzie (Case No. 96-3405)

Professor McKenzie is entitled to qualified immunity on Professor Tonkovich's substantive due process claim for the same reasons that she is entitled to qualified immunity on his procedural due process claim. That is, in merely signing the Letter, refusing to testify, and dating a student, Professor McKenzie neither subjected Professor Tonkovich, nor caused Professor Tonkovich to be subjected, to a deprivation of his substantive due process rights. Furthermore, Professor Tonkovich has cited no clearly established law standing for the proposition that taking any of these actions violates one's substantive due process rights.

### 4. Appeal of the University General Counsel (Case No. 96-3406)

We have already discussed the specific allegations against Ms. Thomas and Ms. Marino. Professor Tonkovich has failed to cite any clearly established law that would lead us to believe that any of the actions they took or failed to take caused the deprivation of his substantive due process rights. For this reason, Ms. Thomas and Ms. Marino are entitled to qualified immunity on Professor

Tonkovich's substantive due process claim.

### 5.  Appeal of Law School Faculty Members (Case No. 96-3407)

Professors Shapiro, Robinson, Dayton, Schroeder, and Sward argue that they are entitled to qualified immunity on Professor Tonkovich's substantive due process claim because the allegations against them do not show a violation of a constitutional right at all, much less a clearly established right.  We have already discussed the specific allegations against the Law School faculty members, and we will not repeat them here.  We agree that Professor Tonkovich has pointed to no Supreme Court or Tenth Circuit precedent establishing that any of their actions could constitute a violation of one's substantive due process rights.  We shall, however, address two specific allegations.

Professor Tonkovich claims that two of the Law School faculty members violated his substantive due process rights by stating that the Law Student had accused him of rape.  However, "[a] substantive due process violation must be something more than an ordinary tort to be actionable under § 1983."  Abeyta v. Chama Valley Indep. Sch. Dist. No. 19, 77 F.3d 1253, 1257 (10th Cir. 1996). Professor Tonkovich may have a cause of action against these professors or against the University under state law, but he has failed to meet his burden on qualified immunity as to a federal constitutional claim.

As to Professor Tonkovich's substantive due process claim based on a lack of fair warning of prohibited conduct, the Law School faculty members argue that this claim contains no allegations addressed specifically to them. That is, they argue that Professor Tonkovich did not allege that they had a duty to warn him of what kind of conduct the Faculty Code prohibited. Additionally, they argue, Professor Tonkovich *was* put on notice that exploiting a student for his own benefit was a violation of the Faculty Code. We agree. For these additional reasons, the Law School faculty members are entitled to qualified immunity on Professor Tonkovich's substantive due process claim.

### 6. Appeal of the Chancellor's Office (Case No. 96-3408)

Professor Tonkovich argues that the University violated his substantive due process rights by ignoring its six-month statute of limitations for sexual harassment charges. However, as counsel for the Board of Regents pointed out at oral argument, the charges against Professor Tonkovich were not solely based on sexual harassment. Professor Tonkovich was charged with violating an ethical provision of the Faculty Code. Even if a claim of sexual harassment was time-barred, the claim of an ethical violation was not. We cannot say that it was unconstitutionally arbitrary for the University to proceed with the prosecution, even though some of the charges involved sexual misconduct. Furthermore,

Professor Tonkovich has failed to cite clearly established law demonstrating that a reasonable University official in the Chancellor's position would have known that going forward with the prosecution would have violated Professor Tonkovich's substantive due process rights.

Next Professor Tonkovich claims that the staff members of the Chancellor's office violated his substantive due process rights by attempting to discourage him from exercising his right to a hearing. Specifically, he claims that after he requested a hearing, University administrators warned him that past conduct might be cause for future disciplinary action. In addition, the University increased the possible sanction from a one-year paid teaching suspension to dismissal. He claims that he was fired for asserting his innocence and demanding a hearing. We note that as the investigation progressed, the complaints against Professor Tonkovich mounted. There was nothing unconstitutionally arbitrary about extending the investigation or about changing the proposed disciplinary action.

Professor Tonkovich next argues that Chancellor Budig violated his substantive due process rights because the charges against him and the recommended sanction lacked a rational basis. However, after the investigation was completed, the University had its side of the story, and Professor Tonkovich had his side of the story. Even taking Professor Tonkovich's version of the facts

as true, as we must, we cannot say that the charges and the penalty he faced were unconstitutionally arbitrary. For these reasons, we conclude that the district court erred in denying the motion to dismiss the substantive due process claim against the staff members of the Chancellor's office on qualified immunity grounds.

After carefully considering Professor Tonkovich's allegations and each of the defendants' arguments, we conclude that the district court erred in denying the defendants' motions to dismiss any "substantive due process" claim Professor Tonkovich may have asserted. Professor Tonkovich's substantive due process argument on appeal takes up almost nineteen pages in his brief but contains very little legal authority. Pages and pages of facts are no substitute for citations to clearly established law. Nor can they meet Professor Tonkovich's burden on qualified immunity. We hold that each of the individual defendants is entitled to qualified immunity on Professor Tonkovich's § 1983 claim based on a violation of his substantive due process rights.

**C. Are the Defendants Entitled to Qualified Immunity on Professor Tonkovich's Equal Protection Claim?**

According to the Equal Protection Clause of the Fourteenth Amendment, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Clause "embodies a general

rule that States must treat like cases alike but may treat unlike cases accordingly." Vacco v. Quill , ____ U.S. ____, 117 S. Ct. 2293, 2297 (1997). Unless a legislative classification or distinction burdens a fundamental right or targets a suspect class, courts will uphold it if it is rationally related to a legitimate end. Id. Professor Tonkovich does not allege that a fundamental right is at stake, nor does he allege that he is a member of a suspect class. Thus, in order to prevail on his equal protection claim, he must show that the University treated him differently than others "similarly situated . . . and that this different treatment lacked a rational basis." Landmark Land Co. of Oklahoma v. Buchanan , 874 F.2d 717, 722 (10th Cir. 1989); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439-40 (1985).

Professor Tonkovich alleges that the defendants violated his equal protection rights because the University has not penalized other professors, much less dismissed them, for dating their students. He points out that not only did other law professors openly date students but that the Law School actually promoted social activities between professors and students.

The district court concluded that "[a]llegations that these defendants disciplined plaintiff for a faculty-student relationship, without similar discipline for other professors who had relationships with students, establish a possible violation of plaintiff's right to equal protection." Aplts' App. vol. IV, doc. 18 at

1356. There are at least two crucial problems with the district court's conclusion. First, as many defendants have pointed out, Professor Tonkovich has failed to allege facts sufficient to establish that he is similarly situated to law professors who dated students. Professor Tonkovich was not charged with dating a student. He was charged with exploiting a student for his own private advantage by engaging one of his students in a discussion of grades and then having sexual relations with her. Although we must accept as true Professor Tonkovich's claim that he did not engage in the charged behavior, see Aplts' App. vol. I, doc. 1 at 60, we must also accept as true the fact that this is part of what the University prosecuted him for and found him guilty of, see id. at 57-58. In any event, Professor Tonkovich does not allege that he was dating the Law Student, or any of his other students.

Second, the district court's conclusion is infirm because it lumps all of "these defendants" together despite the fact that each of the defendants had different powers and duties and took different actions with respect to Professor Tonkovich. Although the district court acknowledged that it must identify on the record defendants' conduct that violated clearly established law, see Aplts' App. vol. IV, doc. 18 at 1342, it wholly failed to identify specific actions taken by particular defendants that could form the basis of an equal protection claim. For example, the district court did not point to any particular action taken by a Law

69

School faculty member that can be said to have caused a deprivation of Professor Tonkovich's equal protection rights. In this way, the district court erred in failing to grant the Law School faculty members qualified immunity.

It is not necessary for us, however, to consider the specific allegations against each defendant because at the heart of any equal protection claim must be an allegation of being treated differently than those similarly situated. Professor Tonkovich would have had to allege that other professors who had sex with a student, in a manner that exploited the student, were not treated the way he was treated by University officials. Therefore, we conclude that the district court erred when it ruled that the defendants are not entitled to qualified immunity on Professor Tonkovich's equal protection claim. We hold that each of the individual defendants is entitled to qualified immunity as to Professor Tonkovich's § 1983 claim based on a violation of his right to equal protection of the laws.

## III. CONCERTED ACTION

Professor Tonkovich argues that the reasonable inference to be drawn from all of the allegations in his complaint is that the defendants engaged in concerted action with the common goal of terminating his employment with the University. Professor Tonkovich claims that the reason the University handled his case the

way it did and the reason he was ultimately dismissed is because of his outspoken political conservatism and because he supported an unpopular candidate during a divisive dean search at the Law School. [10] By raising the specter of a conspiracy, he attempts to avoid a grant of qualified immunity to the individual defendants.

It is true that on a motion to dismiss, we must draw all reasonable inferences in Professor Tonkovich's favor. Swanson, 750 F.2d at 813. However, we do not think that Professor Tonkovich has properly pled a claim that the individual defendants acted in concert to deprive him of his constitutional rights. Put differently, we do not think that such an inference is reasonable.

At oral argument, counsel for the Law School faculty members and counsel for Ms. Thomas and Ms. Marino argued that Professor Tonkovich did not allege a civil rights conspiracy under 42 U.S.C. § 1985 in his complaint. Counsel for Professor Tonkovich conceded that Professor Tonkovich did not plead a § 1985 claim. However, he claims that he has met his burden of showing that the defendants violated clearly established rights under § 1983. For example, he argues, the fact that some of the Law School faculty members met with certain administrators during the investigatory process and then signed the Letter soliciting complaints from students is enough to show that the faculty members

---

[10]As noted above, the district court ruled that the defendants were entitled to qualified immunity on Professor Tonkovich's First Amendment claim based on these allegations.

were acting in concert with the administrators to deprive him of his constitutional rights.

Allegations of conspiracy may, indeed, form the basis of a § 1983 claim. Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994). However, a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants. Id. "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." Id. (quotation omitted).

Professor Tonkovich presents us with nothing more than conclusory allegations. We do not think it is reasonable to infer, for example, that because certain Law School faculty members met with certain administrators during the investigation, they were conspiring with one another and with the Hearing Committee who ultimately found against Professor Tonkovich. Furthermore, there is no indication that the Hearing Committee members or the Regents were even aware of the divisive dean search or of the candidate whom Professor Tonkovich supported. Professor Tonkovich has simply failed to carry his burden of alleging the facts necessary to support his claim of conspiracy on qualified immunity.

## IV. CONCLUSION

Ironically, Professor Tonkovich has said both too much and too little. His

complaint certainly does not follow the dictates of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8(a) ("A pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim . . . ."). He pled facts extensively and repetitively in a 101-page complaint. However, as we have noted, facts by the truckload are simply not enough to meet a plaintiff's burden on qualified immunity.

At the same time, we are certainly less than sanguine about some of the alleged actions taken by various University officials. In addition, the allegations of various violations of University policy cause us some discomfort. We do not know if we would have reached the same result that the Hearing Committee reached, by a close 3-2 vote. However, as we stated earlier, "[t]he Due Process Clause is not a guarantee against incorrect or ill-advised personnel decisions." Collins , 503 U.S. at 129 (quotation omitted).

As noted legal scholar Alexander Bickel observed, "[T]he highest morality almost always is the morality of process." Alexander Bickel, The Morality of Consent 123 (1975). The process described in Professor Tonkovich's complaint, a hearing spanning nine months in conjunction with two post-termination remedies, clearly comports with the process required by the law of our land. The Due Process Clause does not guarantee that the University of Kansas would reach a result with which Professor Tonkovich agreed.

In summary, we conclude that the district court erred when it denied the defendants' motions to dismiss based on qualified immunity. We hold that each of the individual defendants is entitled to qualified immunity on Professor Tonkovich's remaining § 1983 claims, i.e., violations of procedural due process, substantive due process, and equal protection rights. We REVERSE the district court's ruling to the contrary and REMAND the case to the district court with instructions to dismiss the remaining § 1983 claims against the individual defendants on qualified immunity grounds and for further proceedings consistent with this opinion. [11]

---

[11] Finally, we deny Professor Tonkovich's pending motion for leave to file a sur-reply.