Dr. Sunil BABBAR, Plaintiff,

v.

Dr. Yar M. EBADI, Dr. Bruce J. Prince, Dr. Stanley W. Elsea, Dr. James R. Coffman, Dr. Jon Wefald, and Kansas State University, Defendants.

No. 97–2677–JWL.

United States District Court, D. Kansas.

Dec. 31, 1998.

**1270**

Sean M. Dwyer, Wichita, KS, Martin F McMahon, Martin F. McMahon & Assoc., Washington, DC, for plaintiff.

Richard H. Seaton, Kansas State University, Manhattan, KS, for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff filed suit against defendants alleging that defendant Ebadi maliciously interfered with his tenure evaluation process; that the individual defendants conspired to deny him tenure and to deprive him of the equal protection of the laws in violation of 42 U.S.C. § 1985(3); that defendant Kansas State University denied him tenure on the basis of his sex, national origin and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and that the individual defendants violated his right to substantive due process as guaranteed by the Fourteenth Amendment. Plaintiff also asserts two separate claims for injunctive relief against defendant Wefald and de-

fendant Kansas State University, respectively, and requests the court award tenure to plaintiff. This matter is presently before the court on defendants' motion for summary judgment (doc. # 46). For the reasons set forth below, defendants' motion is granted in its entirety and plaintiff's complaint is dismissed.

## I. Facts[1]

Plaintiff Sunil Babbar was employed as an assistant professor at Kansas State University in the Department of Management in the College of Business Administration from 1990 through May 1997. Defendant Yar M. Ebadi is Dean of the College of Business Administration. He has served as dean or interim dean since July 1, 1995. Defendant Ebadi was head of the Department of Management in 1990 when plaintiff was hired. Defendant Bruce J. Prince is head of the Department of Management, a position he has held since July 1995. He received tenure as a term of his appointment in 1995 as head of the department. Defendant Stanley W. Elsea is a tenured member of the Department of Management and currently is associate dean of the College of Business Administration. Defendant James R. Coffman is provost at Kansas State University, a position he has held since July 1987. Finally, defendant Jon Wefald is president of Kansas State University.

Prior to being considered for tenure at Kansas State University, an assistant professor serves a series of annual appointments during an extended probationary period. Decisions concerning tenure must be made before or during the sixth year. Candidates not approved for tenure are notified by their dean that the seventh year of service constitutes a terminal appointment. The university's tenure standards include the following:

C100.1. General Principles. There can be no simple list of accomplishments that, when achieved, guarantee that a faculty member will obtain tenure. Instead, tenure is granted. This action, taken by the Kansas Board of Regents, is based on the assessment of the tenured faculty of the University that a candidate has made out-standing contributions in appropriate academic endeavors. By granting tenure only to such individuals, the continued excellence of the University is ensured.

\*     \*     \*     \*     \*     \*

C100.3. Tenure is not a right accorded to every faculty member. Nor is it granted simply as a result of a candidate's routinely meeting assigned duties with a record free of notable deficiencies.

The university's procedure for evaluating tenure candidates requires that a candidate compile and submit a file documenting his or her accomplishments. The tenured faculty individually review the candidate's file, meet to discuss the application, and then advise the department head regarding the candidate's qualifications for tenure. The department head forwards his or her written recommendation to the dean, accompanied by an explanation for the recommendation rendered. Each college is required to have an advisory committee on promotion and tenure. The dean, after consulting the department head and the college advisory committee, submits his or her recommendation to the provost. The faculty member is notified by the dean of his or her recommendation and of the report of the advisory committee. After consultation with the dean, the provost either recommends a grant of tenure to the Board of Regents or makes a decision denying tenure.

During the fifth year of his appointment (1994–95), plaintiff applied for early tenure consideration. His colleagues in the Department of Management voted 6 to 1 against recommending tenure. Plaintiff then withdrew his application. In the fall of 1995, plaintiff again applied for tenure. The tenured faculty in the department voted 4 to 1 against recommending tenure, with two faculty members abstaining. The department head, defendant Bruce Prince, then forwarded a written recommendation against tenure to the dean, defendant Ebadi.

In his recommendation, Dr. Prince explained in detail both the criteria considered

---

1. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

in the tenure decision (*i.e.*, teaching, research and collegiality) and the department's evaluation of plaintiff's application in light of those specific criteria. As set forth in Dr. Prince's written recommendation, although the tenured members of the department assessed plaintiff's teaching skills as "generally positive," the faculty had several criticisms about plaintiff's performance in the area of research. In fact, as noted in the recommendation, concerns about plaintiff's research "were the most significant factor in the overall negative response" to plaintiff's application for tenure. Faculty members described plaintiff's research and writing skills as "weak on methodology;" "brochure quality writing;" "barely passes the minimum criteria;" "easy to read;" "common sense statements of existing literature;" and "engages in lots of self-aggrandizement." According to Dr. Prince's assessment, plaintiff "seem[ed] most comfortable writing to a non-academic audience." Dr. Prince also noted that plaintiff's written work "had not been presented in higher tier academic journals."

In his recommendation, Dr. Prince also described the "harshness" of plaintiff's tenured colleagues' criticisms with respect to collegiality. Specifically, Dr. Prince wrote:

> Phrases such as "two-faced," "zero collegiality," "superiority complex," "will say one thing and do another," and "will say different things to different people" were easy and unequivocal conclusions for a number of departmental tenured faculty.

By way of example, Dr. Prince highlighted an incident that occurred earlier that fall. Apparently, plaintiff had distributed to all department heads a chart purporting to summarize the productivity of the faculty in the College of Business Administration. The chart was completely unsolicited. In his chart, plaintiff had the highest number of publications. According to Dr. Prince, a closer examination revealed that plaintiff

> was more than generous in how he treated himself in that analysis. The data were gleaned from past reports of faculty activities. But, [plaintiff] adds more recent "publications" for himself and does not give all others equal treatment. The report adds together what I see as "apples and oranges" in coming up with the "Total Productivity" measure. Top-tier journal

articles and books count the same as regular conference proceedings. Worse yet, "table topic" presentations at the DSI conference ([plaintiff] had three this fall), which are simply paper abstracts (several are presented on a single page), also count the same as books and journal articles.

In short, Dr. Prince concluded that plaintiff's distribution of the document demonstrated poor judgment, served to "unnecessarily irritate people" and "provided an additional concrete basis for many tenured faculty members' perception that [plaintiff] engages in tactless and inaccurate self-promotion."

The college advisory committee on promotion and tenure, consisting of a representative from each of the four departments in the college, reviewed plaintiff's application and voted unanimously against recommending tenure. The written recommendation from the committee chair states, in its entirety, as follows:

> The vote was negative. [Plaintiff's] research was described as methodologically weak and lacking in overall quality. He was described as a good teacher but poor colleague within his department. He was characterized as being unable to mentor junior faculty. Two members of the committee described him as engaging in unethical behavior on various occasions. They stated they had first-hand knowledge of these incidents.

Dr. Ebadi then advised plaintiff that, based on the recommendations of plaintiff's departmental faculty, department head, and the College Committee on Promotion and Tenure, he would not recommend plaintiff for promotion and tenure. Dr. Ebadi identified the inadequacy of plaintiff's research program as the "primary reason" for his decision. Plaintiff appealed the denial of his tenure application to the provost, defendant Coffman. In a written response to plaintiff, Dr. Coffman stated, in part, as follows:

> In your case, the qualified faculty voted 4 no, 1 yes, and 2 abstaining for both promotion and tenure. In addition, the department head made a negative recommendation, as did the college wide advisory committee and the dean. This is a collective judgment leading to a negative recom-

mendation by the very people most qualified to make it.

The process followed did not violate university policy or procedure. I do not believe discrimination to be involved, having reviewed the ethnic and gender mix of the department and college. I do not believe that all of the faculty and administrators who reviewed your application and made a collective recommendation did not consider the material, or in someway conspired to do you ill.

Ultimately, Dr. Coffman upheld the recommendation of the college.

Thereafter, plaintiff challenged the decision through the Kansas State University grievance procedure. The grievance procedure provides for a hearing before a panel of the general faculty grievance board. The faculty grievance board is selected at random and composed of tenured faculty members. Each hearing panel consists of four members and a presiding officer. With respect to plaintiff's hearing, the members of the panel were all from outside the College of Business. Plaintiff was represented at the hearing by a spokesman, and also had an attorney present to advise him. The panel heard evidence for two full days.

All six tenured faculty members of the Department of Management who voted against plaintiff's 1995 tenure application or abstained from voting testified at plaintiff's grievance hearing that their primary concern was the inferior quality of plaintiff's research. Collegiality was a concern for some, but not all, of those who declined to support him. Brian Niehoff, the only tenured member of the department who voted in favor of plaintiff's tenure, testified at the grievance hearing that the departmental discussion on plaintiff's application was "very professional." He also testified that he would have a hard time supporting plaintiff for tenure again because of "ethics."

After hearing the evidence, the grievance panel rendered a written report and recommendation to the president, defendant Jon Wefald. In its report, the grievance panel determined that the department failed to follow established procedure in evaluating plaintiff's research by, *inter alia*, arbitrarily rejecting the opinions of outside reviewers of plaintiff's tenure and promotion file and by adding a requirement that research be "empirical" late in the tenure review process. The panel concluded that the department members' description of "acceptable research" as presented in the hearing was inconsistent with the written policy of the department and that the written policy should prevail. In the panel's view, plaintiff met the criteria for research as described in the department's written policies and procedures and, thus, should not have been denied tenure on the basis of his research.

The panel also determined that the department improperly applied "collegiality" as a criterion for tenure and promotion. Specifically, the panel noted that "collegiality" was not considered a criterion in tenure and promotion decisions in the Department of Management until November 1, 1995—after plaintiff had submitted his application.[2] Moreover, the panel found "no evidence that collegiality criteria, standards, and guidelines were approved by the dean and the provost before the Tenure and Promotion vote in the department and subsequent decisions." Despite these findings, however, the panel recognized that "the faculty of the Department of Management and the Dean of the College of Business Administration clearly perceive[d] a lack of collegiality on the part of [plaintiff]" and were "quite disturbed by his behavior." The panel also expressed "no doubt that a collegial relationship between [plaintiff] and his colleagues and administrators does not exist at this time, and . . . that [plaintiff] is, to a degree, responsible for creating this relationship."

In the end, despite the fact that the department deviated from proper procedure in assessing plaintiff's application for promotion and tenure, the panel concluded that plaintiff's "continued long-term employment . . . is not in the best interest of the University, the College of Business Administration, the Department of Management, or [plaintiff]." In

---

2. Dr. Prince's written recommendation to Dr. Ebadi explains that the "discussion of collegiality criteria stemmed from an invitation by Provost Coffman for departments to explicitly determine if collegiality should be formally considered."

reaching this decision, the panel emphasized that "professional relationships between [plaintiff] and his department colleagues have been permanently and irreparably broken." In sum, the panel recommended that the administration either negotiate a settlement with plaintiff that would include plaintiff's resignation from the University or, as a last resort, grant plaintiff tenure and promotion.[3]

In response to the recommendation of the grievance panel, the president of the University, defendant Wefald, issued a written memorandum in which he concluded that Kansas State University would not tenure plaintiff.[4] In reaching his decision, Dr. Wefald emphasized the guiding principle that "tenure is a peer-review process":

> The unanimous vote against tenuring plaintiff by the College Committee, as well as the overwhelming votes against his being tenured by his department, certainly would not lead us to believe that he meets the standard that "the institution should be left without a reasonable doubt as to the faculty member's qualifications for tenure before it reaches a favorable decision."

In essence, Dr. Wefald was simply "not convinced that errors in certain procedures noted by the Grievance Panel would have changed the outcome of the votes had they not been made."

Plaintiff's annual appointment contract in force during the year of his tenure consideration (1995–96) expired of its own terms on June 17, 1996. It required, by reference to university regulations, that he receive one year's advance notice of his non-reappointment. Plaintiff received this notice in the form of a final, terminal contract for the 1996–97 academic year, which expired of its own terms on June 10, 1997.

On December 31, 1997, plaintiff filed this suit alleging, *inter alia*, that defendants denied him tenure on the basis of his sex, religion and national origin. Plaintiff is of Indian national origin and his religion is Hindu. Plaintiff concedes, however, that he never discussed his religion with anyone in the College of Business and that no one in the College of Business made any statements concerning plaintiff's religion. In addition, plaintiff cannot recall any conversations in the College of Business regarding his national origin.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting

---

**3.** The panel expressly concluded that it found no evidence to support a charge of discrimination.

**4.** Dr. Wefald also noted that a settlement including plaintiff's resignation from the University was not necessary in that plaintiff was employed under a terminal contract.

burdens on summary judgment). The non-moving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### III. Plaintiff's Claim Against Defendant Ebadi for Malicious Interference with Tenure Evaluation Process

Plaintiff claims that defendant Ebadi maliciously and intentionally interfered with his tenure evaluation. Because Kansas does not recognize a separate cause of action for intentional interference with the tenure evaluation process, the court construes plaintiff's claim as one for either tortious interference with a contract or tortious interference with a prospective business advantage. Although "these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter at protecting future or potential contractual relations." *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986). Defendant maintains that plaintiff cannot survive summary judgment on either claim. As set forth in more detail below, the court agrees with defendant Ebadi and grants his motion for summary judgment on plaintiff's malicious interference claim.

#### A. Interference with Existing Contract

It is well settled under Kansas law "that a party who, without justification, induces or causes a breach of contract will be answerable for damages caused thereby." *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986) (citations omitted). The essential elements of a claim for tortious interference with a contract are: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his or her intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom. *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 169, 872 P.2d 252 (1994). Defendant Ebadi maintains that plaintiff cannot establish the third element of his cause of action because Kansas State University did not breach its contract with plaintiff. The court agrees.

Significantly, the contract that existed between defendant Kansas State University and plaintiff during the year of plaintiff's tenure consideration (1995–96) expired of its own terms on June 17, 1996. It required, by reference to university regulations, that plaintiff receive one year's advance notice of his non-reappointment. He received this notice, and defendant issued plaintiff a final, terminal contract for the 1996–97 academic year. It expired of its own terms on June 10, 1997. The essence of plaintiff's claim is that the University did not renew his contract beyond June 1997. It had no obligation to do so, however, because it provided the requisite notice of non-reappointment as set forth in the contract. Under these circumstances, no breach of contract has occurred and no claim of interference can be made. *See Rodriguez v. ECRI Shared Servs.,* 984 F.Supp. 1363, 1367 (D.Kan.1997) (rejecting tortious interference claim where party terminated contract according to provisions expressly included in the contract). *See also Randolph v. Board of Public Utilities,* 983 F.Supp. 1008, 1017 (D.Kan.1997) (rejecting tortious interference in employment-at-will context because "an employment at will contract is not breached by termination"). Because plaintiff cannot demonstrate that the University breached its contract with him, summary judgment in favor of defendant Ebadi is granted to the extent plaintiff claims that Dr. Ebadi tortiously interfered with an existing contract.

#### B. Interference with Prospective Contract

Kansas also recognizes a claim for tortious interference with contractual expectations or a prospective business advantage, which requires proof of the following ele-

ments: "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by the defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." *Noller v. GMC Truck & Coach Div.,* 244 Kan. 612, 620, 772 P.2d 271 (1989) (quoting *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986)). According to defendant, plaintiff cannot establish that he was reasonably certain to have received tenure, and thus cannot satisfy the third element of his cause of action. Again, the court agrees.

Plaintiff testified that the decision to grant tenure lies within the discretion of the University and that no one ever promised him tenure. Plaintiff further admitted that the tenure process involves decisions at several levels and that the outcome is uncertain until all decisions have been made. Thus, although plaintiff may have had a subjective expectation that he would receive tenure, there is no evidence to show that he was reasonably certain to have realized that expectancy. Significantly, plaintiff's 1995–96 contract specified that his appointment to a "probationary status" was for a period of nine months and that his appointment was subject to notice of non-reappointment. *See Williams v. Weaver,* 145 Ill.App.3d 562, 99 Ill.Dec. 412, 495 N.E.2d 1147, 1152 (1986) (community college instructor who was denied reappointment did not have reasonable expectancy of continued employment and, thus, failed to state claim for tortious interference with prospective business advantage where contract allowed the Board to terminate the employment of any nontenured teacher by dismissal or nonrenewal of his probationary contract). Moreover, the court has not uncovered any provisions in the portions of the faculty handbook available to it suggesting that plaintiff could expect continued employment. On the contrary, the handbook explicitly states that a probationary faculty member "does not as probationer have

what can be considered a claim to his/her position." The handbook also indicates that tenure is not a "guarantee" or a "right." Faculty Handbook, C100.1 ("There can be no simple list of accomplishments that, when achieved, guarantee that a faculty member will obtain tenure."); C100.3 ("Tenure is not a right accorded to every faculty member. Nor is it granted simply as a result of a candidate's routinely meeting assigned duties with a record free of notable deficiencies."). In light of these circumstances, the court concludes that plaintiff was not "reasonably certain" to have continued his relationship with the University.[5] *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (assistant professor with no tenure rights to continued employment did not possess property interest for purposes of due process doctrine where appointment contract "secured absolutely no interest in re-employment for the next year" and no state statute or university rule secured his interest in re-employment); *Weathers v. West Yuma County Sch. Dist. R–J–1,* 530 F.2d 1335, 1336–38 (10th Cir. 1976) (untenured teacher employed under contracts containing specific terms did not possess a property interest protected by Fourteenth Amendment where he possessed no statutory or contractual right of continued employment and failed to show any informal custom or policy of re-employment). Defendant Ebadi's motion for summary judgment is granted on plaintiff's claim for tortious interference with a prospective business advantage.

**IV. Plaintiff's § 1985(3) Claim Against Defendants Ebadi, Prince, Elsea, Coffman and Wefald in their Individual Capacities**

■■ In Count II of his complaint, plaintiff alleges that defendants Ebadi, Prince, Elsea, Coffman and Wefald conspired to deny him tenure—a conspiracy that, according to plaintiff, deprived him of the equal protection of the laws in light of his gender, religion and national origin. Although § 1985(3) does not create any substantive

---

5. This is also true in light of the fact that plaintiff had applied for tenure the previous year and his

departmental colleagues voted 6 to 1 against him.

rights, it provides a remedy when individuals conspire to deprive a member of a protected class of equal protection of the laws or equal privileges and immunities under the laws. *See Gallegos v. City & County of Denver,* 984 F.2d 358, 362 (10th Cir.1993) (citing *Dixon v. City of Lawton,* 898 F.2d 1443, 1448 (10th Cir.1990)). To prove a conspiracy in violation of § 1985(3), plaintiff must show "(1) the existence of a conspiracy (2) intended to deny [him] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa,* 45 F.3d 1417, 1423 (10th Cir.1995) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Ward v. St. Anthony Hosp.,* 476 F.2d 671, 676 (10th Cir. 1973)). Plaintiff must also demonstrate that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 267–68, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (quoting *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790). In support of their motion for summary judgment, defendants maintain that plaintiff has failed to demonstrate the requisite discriminatory animus and that he has failed to show a "meeting of the minds" or an agreement among the defendants, discriminatorily motivated, to deprive him of equal protection. As set forth below, the court agrees with defendants. Summary judgment in favor of defendants on plaintiff's § 1985(3) claim is appropriate.

As an initial matter, plaintiff has failed to come forward with any evidence that "invidiously discriminatory animus" lay behind the defendants' actions here. Significantly, the record is devoid of any allegations of a discriminatory animus on the part of defendants Prince, Elsea and Wefald. With respect to defendant Coffman, plaintiff alleges only that defendant Coffman set up a "special external review process" for tenure candidates Hagman and Ainsworth, but that Dr. Coffman never set up an external review process for a candidate of Indian national origin or the Hindu faith. In an effort to demonstrate discriminatory animus allegedly harbored by defendant Ebadi, plaintiff relies only on the fact that Dr. Ebadi is from Afghanistan and is a Muslim.[6] Finally, plaintiff alleges that no one of Indian national origin or the Hindu religion has ever been tenured in the department.

This evidence falls far short of establishing "invidious" discriminatory animus on the part of defendants Coffman or Ebadi. *See Bray,* 506 U.S. at 274, 113 S.Ct. 753 (noting that the meaning of "invidious" is suggested by the dictionary definition of the word— "[t]ending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating." (quoting *Webster's Second International Dictionary* 1306 (1954))). As the Supreme Court has stated, the "invidiously discriminatory animus" element requires "that the defendant have taken his action 'at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.' " *Id.* at 275–76, 113 S.Ct. 753 (quoting *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). As described in more detail in connection with plaintiff's Title VII claim, plaintiff has failed to come forward with any evidence sufficient to support an inference that defendants' proffered reasons were pretextual for discrimination on the basis of his sex, national origin or religion. Moreover, plaintiff concedes that he never discussed his religion with anyone in the college of business, that no one made

---

**6.** Plaintiff also suggests that Dr. Ebadi "mistreated" another faculty member of Indian national origin and the Hindu religion, Dr. Deivan Durai. The record does not support plaintiff's allegation. Dr. Durai, a computer information specialist employed by defendant Kansas State University, averred that Dr. Ebadi invited him to teach a class in the management department. Dr. Durai agreed. Dr. Durai further averred that Dr. Ebadi agreed to ask the University to alter Dr. Durai title from Computer Information Specialist to Computer Information Specialist and Assistant Professor of Management. Later, Dr. Ebadi apparently informed Dr. Durai that he had not agreed to alter his title. According to Dr. Durai, he was "left wondering if [he] would have been so treated by Dr. Ebadi had he been Caucasian or non-Indian." Dr. Durai's sheer speculation that Dr. Ebadi harbored a discriminatory animus is insufficient to raise a genuine issue of material fact for trial.

any statements concerning his religion, and that he could not recall any conversation concerning his national origin. In sum, plaintiff has failed to produce any direct or circumstantial evidence that could reasonably support a finding that defendants were motivated by a class-based discriminatory animus.

Finally, plaintiff has not established, by either direct or circumstantial evidence, that there was a "meeting of minds" or an agreement among the defendants, discriminatorily motivated, to deprive plaintiff of equal protection. *See Gallegos,* 984 F.2d at 364 (citations omitted). Plaintiff apparently believes that a conspiracy existed simply because each of the defendants opposed his tenure application. The mere fact that each of the defendants believed that plaintiff was not an appropriate candidate for tenure is insufficient to raise an inference that the defendants agreed to deprive plaintiff of his rights. The record is devoid of any evidence or suggestion that any of the defendants discussed plaintiff's national origin, religion or sex at any time. The record is similarly devoid of any evidence suggesting that any of the defendants discussed plaintiff's application for tenure outside the ordinary decision-making process.[7] In the absence of such evidence, a reasonable jury could not infer that a discriminatorily motivated conspiracy existed which acted to deprive plaintiff of equal protection. *See id.* (citations omitted).

## V. Plaintiff's Title VII Claim Against Defendant Kansas State University

Plaintiff claims that defendant Kansas State University denied him promotion and tenure based on his sex, national origin and religion in violation of Title VII. The court analyzes plaintiff's claims under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of his prima facie case of discrimination. *See Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995).

Once plaintiff establishes his prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *EEOC v. Flasher Co.,* 986 F.2d 1312, 1317–19 (10th Cir.1992)). If the defendant comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff "to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (citing *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 (10th Cir.1994)). If the plaintiff proffers such evidence, the motion for summary judgment must be denied. *Id.*

### A. Plaintiff's National Origin and Religious Discrimination Claims

■ For purposes of its motion, defendant Kansas State University assumes that plaintiff has established a prima facie case of national origin and religious discrimination. Moreover, defendant has proffered legitimate, nondiscriminatory reasons for its employment decision. First, defendant has produced ample evidence that plaintiff's departmental colleagues, as well as the department head, the college promotion and tenure committee and the dean, found plaintiff's research deficient in numerous aspects. Second, defendant has come forward with considerable evidence that plaintiff's departmental colleagues, the department head, the college promotion and tenure committee and the grievance panel all believed that plaintiff lacked collegiality. The burden, then, rests on plaintiff to show that there is a genuine dispute of material fact as to whether defendant's articulated reasons for its decision is pretextual. As described in more detail below, plaintiff has not met his burden.

■ In support of his pretext argument, plaintiff primarily relies on the grievance panel's determination that the department deviated from proper procedures when it evaluated plaintiff's tenure application. In

---

7. In fact, Brian Niehoff, the only tenured member of the department who voted in favor of plaintiff's tenure, testified at the grievance hear-

ing that the departmental discussion on plaintiff's application was "very professional."

that regard, plaintiff claims that the department (driven by Drs. Ebadi and Prince) contrived "collegiality" and "empirical research" requirements in order to deny plaintiff tenure. Title VII, however, does not afford plaintiff a flawless or fair tenure review process—it simply precludes the University from making an adverse tenure decision based, even in part, on plaintiff's national origin or religion. Thus, even though the University may have deviated from its standard procedures in evaluating plaintiff's tenure application (and, indeed, the grievance panel determined that it did), this evidence, standing alone, does not permit an inference that plaintiff's national origin or religion was a motivating factor in the University's tenure decision. Such evidence "goes only to process and not to purpose or motivation," and could not provide a sufficient basis for a jury to find pretext for discrimination. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 623 (10th Cir. 1994); *accord Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir.1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."). In short, plaintiff has failed to show how the University discriminated against him by incorporating collegiality and "empirical research" requirements into the tenure evaluation process. *See Randle*, 69 F.3d at 454–55.

In further support of his pretext argument, plaintiff devotes a significant portion of his papers to a multitude of evidence about his qualifications for tenure. This evidence includes, *inter alia*, charts created by plaintiff purporting to compare his research with the research of other faculty members in the

department and an expert report stating that plaintiff, in light of his superior research program, was "eminently qualified and should not have been denied tenure." However, plaintiff's own perceptions (or the perceptions of his expert) with respect to his qualifications for tenure are irrelevant; it is the perception of the decisionmaker which is relevant. *See Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir.1996) ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.") (citations omitted), *cert. denied sub nom. Doan v. Seagate Technology, Inc.*, 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997).[8] The evidence before the court demonstrates that plaintiff's departmental colleagues, his department head, the promotion and tenure committee and the dean all perceived plaintiff's research as inadequate for purposes of tenure consideration. In such circumstances, plaintiff's assertions that he was more qualified than successful tenure candidates, without more, are insufficient to create an inference that defendants' proffered reasons for denying plaintiff tenure are pretextual. At the very most, plaintiff's evidence supports an inference that defendant may have misjudged plaintiff's qualifications for tenure. Even if defendant erred in assessing plaintiff's application for tenure, such an error is insufficient to support a showing of pretext. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").[9]

Plaintiff also makes a painstaking effort to compare himself to other faculty members,

**8.** Of course, courts will not always simply rely on an employer's assertion that it selected the most qualified candidate. *See, e.g., Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir.1995) (plaintiff withstands summary judgment on failure-to-promote claim despite City's contention that it hired the most qualified applicant where plaintiff presented evidence of pretext in hiring decision and City failed to fire successful candidate after it discovered candidate misrepresented her qualifications).

**9.** Along these same lines, plaintiff vaguely suggests that the perception held by the relevant

decisionmakers that plaintiff lacked collegiality was unfounded. Even if true, this assertion, and the evidence supporting it, does not address the relevant inquiry here—whether the decisionmakers believed that plaintiff lacked collegiality and acted in good faith upon that belief in declining to recommend plaintiff for tenure. *See Jacobs v. Delta Air Lines, Inc.*, 156 F.3d 1243, 1998 WL 514620, at *3 (10th Cir. Aug. 13, 1998) (challenging the veracity of allegations against plaintiff "avoids the relevant inquiry—i.e., whether Delta believed them, and acted in good faith upon that belief in terminating him").

both in and out of the management department, who received tenure. Specifically, plaintiff compares his treatment during the tenure evaluation process to the treatment received by Drs. Constanza Hagmann, Cynthia McCahon, Ross Hightower, Chwen Sheu, Penne Ainsworth, Amir Tavakkol, and defendants Prince and Elsea. The record evidence, however, shows that most of these individuals were not "similarly situated" to plaintiff. Drs. Ainsworth and Tavakkol, for example, were not even faculty members in the management department. They were faculty members in accounting and finance, respectively. Thus, their tenure applications were initially considered by departmental colleagues and a department head different from those who evaluated plaintiff's application. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standard governing performance evaluation...."); *see also Trujillo v. Sanchez*, 76 F.3d 393, 1996 WL 32138, at *2 (10th Cir. Jan. 29, 1996) (plaintiff not similarly situated to other faculty members where complaint failed to allege that the same decisionmaker was involved in other faculty members' tenure cases). Similarly, although Drs. Hagmann, McCahon and Elsea are faculty members in the management department, they were granted tenure several years before plaintiff applied for tenure—under a different dean (Dr. Dan Short) and under a different department head (Dr. James Townsend). Thus, different individuals were involved in those tenure decisions. Finally, the evidence demonstrates that Dr. Prince was granted tenure in connection with his appointment as department head in 1995. In fact, the faculty voted on Dr. Prince's tenure before he arrived. Unlike plaintiff, Dr. Prince was already tenured at another university when Kansas State University hired him to perform administrative duties.

Drs. Sheu and Hightower are sufficiently "similarly situated" to plaintiff for purposes of a pretext analysis. Nonetheless, the uncontroverted evidence demonstrates that these individuals were subjected to a tenure evaluation process identical to plaintiff. Dr. Sheu's application for tenure was considered at the same time that plaintiff's application was considered. The recommendation written by Dr. Prince unequivocally shows that Dr. Sheu's application was considered by the department under the same criteria as used in considering plaintiff's application—research, teaching and collegiality. Unlike plaintiff, Dr. Sheu's research performance was considered "quite strong." Dr. Prince noted that Dr. Sheu displayed "a good range of methodological skills." With respect to the collegiality criterion, the department characterized Dr. Sheu as "a team player," and "helpful." Dr. Prince noted a complete absence of any negative indicators in terms of Dr. Sheu's collegiality. Dr. Hightower applied for tenure the following year. Again, Dr. Prince's recommendation indicates that Dr. Hightower's application was considered by the department under the same criteria as used in considering plaintiff's application—research, teaching and collegiality. The department characterized Dr. Hightower's research as "methodologically strong" with "excellent quantitative skills." His collegial contributions were "very positive"—the department described him as "always helpful" and noted that he "looks for ways to help his colleagues in their effort to contribute to the College mission." This evidence shows that, although the ultimate tenure decision was different, Drs. Sheu and Hightower were not treated differently than plaintiff in any respect. As such, plaintiff has not shown that the reasons offered by defendant for denying plaintiff's tenure application were unworthy of belief or that the decision was motivated by plaintiff's national origin or religion.

Moreover, plaintiff has not come forward with any evidence that defendant's decision to deny plaintiff tenure was motivated in any way by plaintiff's national origin or religion. In an effort to show a discriminatory animus on the part of Dr. Ebadi, plaintiff relies primarily on the fact that Dr. Ebadi is from Afghanistan and that his religion is Muslim. Plaintiff assumes, in light of the fact that plaintiff is from India and a Hindu, that Dr. Ebadi bore a discriminatory animus towards him. Evidence inviting pure speculation is simply insufficient to raise a genuine issue of material fact for trial. The only other evidence plaintiff offers with respect to Dr.

Ebadi's purported discriminatory animus is vague allegations that Dr. Ebadi initially hired plaintiff only after every Caucasian candidate turned down his offer, that Dr. Ebadi misrepresented to plaintiff at the time he was hired that the University would reimburse him for his moving expenses, and that Dr. Ebadi, in 1992, maliciously placed a letter of reprimand in plaintiff's official personnel file. Plaintiff fails to support these allegations with competent evidence. In fact, Dr. Ebadi's affidavit establishes that he selected plaintiff over a white, American-born candidate. In any event, plaintiff's conjecture that Dr. Ebadi's actions show a discriminatory animus is an insufficient basis to deny summary judgment. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

Plaintiff also suggests that an inference of discrimination can be drawn from evidence that Professor David Dilts co-authored articles with other faculty members but not with plaintiff. Apparently, plaintiff believes that defendant Ebadi wanted to assist the tenure applications of Professors Elsea and Hagmann and, in an effort to do so, secured the assistance of Professor Dilts to improve the quality of their publications. Plaintiff believes he was "singled out" by Dr. Ebadi because Dr. Ebadi did not secure similar assistance for him. The record, however, is devoid of any evidence that Dr. Ebadi in fact secured the assistance of Professor Dilts for these candidates. In any event, such evidence simply does not give rise to an inference of discriminatory animus based on national origin or religion.

Finally, plaintiff alleges that no one of Indian national origin or the Hindu religion has ever been tenured in the department. This statistical evidence is so flawed that it does not permit an inference of discrimination. *See Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 979 (10th Cir.1996) (While statistical data may create an inference of discrimination, such data may be "so flawed as to render it insufficient to raise a jury question.") (citing *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 746 (10th Cir.1991)), *cert. denied*, —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997). First, plaintiff's evidence fails to show how many individuals of Indian national origin or the Hindu religion were not tenured by the department. *See*

*Kuhn v. Ball State University,* 78 F.3d 330, 332 (7th Cir.1996) (in failure-to-promote age discrimination case, list of persons promoted by University was "next to worthless" without information concerning how many people, of what age, were not promoted). Without knowing whether any individuals in the protected categories other than plaintiff applied for tenure (and, if so, how many), the court is unable to draw an inference of discrimination from plaintiff's evidence.

In sum, plaintiff has not come forward with sufficient evidence from which a reasonable factfinder could draw an inference that the University's proffered reasons for denying plaintiff tenure were unworthy of belief or that plaintiff's national origin or religion were motivating factors in the University's decision. Defendant's motion for summary judgment is granted with respect to plaintiff's national origin and religious discrimination claims.

### B. Plaintiff's Sex Discrimination Claim

Plaintiff's claim that defendant Kansas State University discriminated against him on the basis of his sex requires an analysis that is somewhat modified from the *McDonnell Douglas* scheme described above. *See Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1534 (10th Cir.1995) (plaintiff claiming "reverse discrimination ... does not necessarily deserve the presumption of discrimination afforded to a member of an ostensibly disfavored minority class"). Specifically, plaintiff, as a member of an historically favored group, must show "background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *See Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1252 (10th Cir.1986) (alteration in original) (citations omitted); *accord Reynolds*, 69 F.3d at 1534.

Applying this legal framework to plaintiff's sex discrimination claim, the court concludes that plaintiff has not established a prima facie case of sex discrimination and, more specifically, that he has not shown that Kansas State University is that "unusual employer" that discriminates against men. The only evidence plaintiff offers in support of his

sex discrimination claim is his belief that he was better qualified for tenure than two women in the management department (and, in fact, the only women in the department) and a female faculty member in the accounting department. This evidence does not suggest that defendant discriminates against men.

Moreover, an affidavit submitted by Dr. Prince establishes that the overwhelming majority of the management department faculty are male. Plaintiff did not controvert this evidence. Of the tenured faculty in the department, five out of seven, including the department head, are male. In addition, Chewn Sheu was approved for tenure at the same time that plaintiff's application for tenure was denied. Dr. Sheu is male. In short, plaintiff's evidence is woefully inadequate to establish a prima facie case of sex discrimination. *Cf. Reynolds*, 69 F.3d at 1534–35 (plaintiff established prima facie case of reverse race discrimination where she was the only white employee in an otherwise all-Hispanic department and Hispanic supervisors made most the relevant employment decisions). Defendant's motion for summary judgment on plaintiff's sex discrimination claim is granted.[10]

## VI. Plaintiff's § 1983 Claim Against Defendants Ebadi, Prince, Coffman and Wefald in their Individual Capacities[11]

■ Plaintiff also asserts a claim under 42 U.S.C. § 1983 for defendants' alleged deprivation of his right to substantive due process. The Due Process Clause of the Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property without due process of law." *Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 489 (10th Cir.1991) (quoting U.S. Const. Amend. XIV). Although the phrase "due process" connotes a right to a fair hearing, the Supreme Court has recognized that the clause contains a substantive component as well. *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir.1998) (quoting *Ar-*

*chuleta*, 936 F.2d at 489). Substantive due process, as distinguished from procedural due process, "guarantees that the state will not deprive a person of [life, liberty or property] for an arbitrary reason regardless of how fair the procedures are that are used in making the decision." *Archuleta*, 936 F.2d at 490 (citation omitted). Moreover, substantive due process claims "are founded upon 'deeply rooted notions of fundamental personal interests derived from the Constitution.'" *Hennigh*, 155 F.3d at 1256 (quoting *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir.1986)).

■ As an initial matter, the court notes that plaintiff has not identified the rights or interests that defendants purportedly violated. *See Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 527 (10th Cir.1998) (in § 1983 action, plaintiff has the burden to identify the rights that he alleges defendants violated) (citing *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir.1994)). To the extent plaintiff alleges he enjoyed a property interest in continued employment, the court questions whether plaintiff's status as an untenured professor, under the circumstances presented here, would be a fundamental property right protected by the substantive due process doctrine. Significantly, plaintiff's 1995–96 contract specified that his appointment to a "probationary status" was for a period of nine months and that his appointment was subject to notice of non-reappointment. Moreover, the court has not uncovered any provisions in the portions of the faculty handbook available to it suggesting that plaintiff could expect continued employment. *Compare Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (assistant professor with no tenure rights to continued employment did not possess property interest for purposes of due process doctrine where appointment contract "secured absolutely no interest in re-employment for the next year" and no state statute or university

---

10. Even if plaintiff had established a prima facie case of sex discrimination, the record is devoid, as explained in connection with plaintiff's other discrimination claims, of any evidence that defendant's proffered reasons for denying plaintiff's tenure application are pretextual.

11. Plaintiff has not named defendant Elsea in his substantive due process claim.

rule secured his interest in re-employment) and *Weathers v. West Yuma County Sch. Dist. R–J–1,* 530 F.2d 1335, 1336–38 (10th Cir.1976) (untenured teacher employed under contracts containing specific terms did not possess a property interest protected by Fourteenth Amendment where he possessed no statutory or contractual right of continued employment and failed to show any informal custom or policy of reemployment) *with Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (genuine issue of material fact existed with respect to whether teacher had a property interest in continued employment where he alleged that college had a *de facto* tenure program and that he had tenure under that program).[12]

Even assuming that plaintiff had a fundamental property interest in continued employment which was subject to substantive due process protection, he has failed to set forth sufficient facts to raise an inference that defendants arbitrarily deprived plaintiff of his property interest. *See Hennigh,* 155 F.3d at 1257 (even assuming plaintiff had a property interest in his employment subject to substantive due process protection, defendants' termination of that interest was not arbitrary or without a rational basis) (citations omitted); *Archuleta,* 936 F.2d at 489 ("If an individual's right to property is entitled to the protection of substantive due process, the state may not arbitrarily take that property from the owner.") (citation omitted).

As the Tenth Circuit has recently reiterated, "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" *Tonkovich v. Kansas Board of Regents,* 159 F.3d 504, 528 (10th Cir.1998) (quoting *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir.1995) (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992))); *accord County of Sacramento v. Lewis,* 523 U.S. 833, —— n. 8, 118 S.Ct. 1708, 1717 n. 8, 140 L.Ed.2d 1043 (1998) (threshold question in analyzing substantive due process challenge is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Tonkovich,* 159 F.3d at 528 (quoting *Uhlrig,* 64 F.3d at 574). Instead, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* (quoting *Uhlrig,* 64 F.3d at 574).

There is no evidence here that any of the individuals involved in plaintiff's tenure determination harbored discriminatory or unconstitutional motives in denying plaintiff's tenure application. In essence, plaintiff's claim is that the defendants misjudged his qualifications for tenure. In an analogous context, the Supreme Court has cautioned that a federal court is not the appropriate forum "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making.'" *See Regents of University of Michigan v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (quoting *Board of Curators v. Horowitz,* 435 U.S. 78, 89–90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)). In *Ewing,* the Court set forth the following standard for analyzing substantive due process claims arising out of academic decisions:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225, 106 S.Ct. 507 (footnote and citation omitted); *accord Harris v. Blake,* 798 F.2d 419, 424 (10th Cir.1986) (rejecting sub-

---

12. Similarly, the court questions whether plaintiff had a liberty interest at stake. *See Roth,* 408 U.S. at 574 n. 13, 92 S.Ct. 2701. (nonretention of a nontenured professor, in itself, does not amount to a deprivation of liberty, even though it might foreclose some employment opportunities).

stantive due process claim where plaintiff-student failed to show that a decision with respect to his grades—and that ultimately resulted in his forced withdrawal from a graduate study program—"was not made with conscientious deliberation through the exercise of professional judgment."). Here, the record unmistakably demonstrates—most notably in the written memoranda of Dr. Prince and Dr. Wefald—that defendants' collective decision to deny plaintiff tenure was "made conscientiously and with careful deliberation." *See Ewing,* 474 U.S. at 225, 106 S.Ct. 507. There is no showing that any of the named defendants (or anyone else for that matter) "did not actually exercise professional judgment in assessing plaintiff's tenure application." *See id.* Accordingly, plaintiff's substantive due process claim fails and the court grants defendants' motion for summary judgment. *See Blake,* 798 F.2d at 425.

### VII. Plaintiff's Claims for Injunctive Relief

In Counts V and VI of his complaint, plaintiff sets forth separate claims for injunctive relief against defendant Wefald and defendant Kansas State University, respectively. In essence, plaintiff asks the court to award plaintiff tenure. Defendant moves for summary judgment on these claims on the basis that plaintiff has failed to allege any cognizable ground indicating that these separate actions fall within the court's federal question, diversity or supplemental jurisdiction. The court agrees. In the absence of any separate basis for his claims for injunctive relief, the court cannot entertain plaintiff's request. To the extent plaintiff's seeks injunctive relief as a remedy for defendants' liability with respect to his claims otherwise alleged (*e.g.,* Title VII), plaintiff's request is denied as moot because the court has determined that no liability exists. Summary judgment is granted to defendants on plaintiff's claims for injunctive relief.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. # 46) is **granted**

and plaintiff's complaint is dismissed in its entirety.

**IT IS SO ORDERED.**